WILLIAM DRULEY

*v.*

WILLIAM ADAM.

*Filed at Ottawa January 18, 1882—Rehearing denied March Term, 1882.*

1.  NOTICE BY POSSESSION—*as to rights of owner of mill site, in respect to diversion of water therefrom.* The owner of a mill site on the Desplaines river, in the settlement of a controversy with the trustees of the Illinois and Michigan Canal in respect to an alleged improper diversion of water by the trustees from the mill site, entered into a written agreement with the canal trustees, in which the respective rights of the parties were defined. The owner of the mill site and the canal trustees were in possession of their respective premises. It was *held,* that such possession was notice of the rights claimed by each to all dealing thereafter with either in respect to the subject matter of that agreement, so that a person who afterwards obtained a grant of the use of water power from the canal trustees was bound to know what the agreement was, and would hold subject thereto.

2.  WATER COURSES—*riparian proprietors—construction of a contract in respect to the diversion of water from the mill site of a lower proprietor.* The agreement spoken of had relation to the use of water to be diverted from the Desplaines river at a point above the mill site, for the purposes of the canal. The machinery of the mill was operated by means of water power derived from the river. The mill owner was a riparian proprietor to the center thread of the stream, and as such entitled to recover for any diversion of the stream to his injury. The pending suit which was brought in settlement by the agreement, involved the right of the canal trustees to so divert the water of the river. In view of these conditions, the owner of the mill site released to the canal trustees "the right to use and appropriate the water of the said Desplaines river at the feeder at" a point above the mill, "for supplying the said canal for the purpose of navigation, in the same manner the water in said river, in connection with other feeders," was then "used for supplying said canal." It was *held,* a use of the water by the canal trustees in excess of that needed for navigation, creating a motive power for the benefit of others, was a use not within the language or spirit of the agreement.

3.  Nor was this restriction in the agreement as to the purpose to which the water from the river might be applied by the canal trustees, limited to such water as might naturally flow in the river without the aid of art, but included all waters which might be introduced into the stream by any means whatsoever—whether by the natural flow of the water, by the increased drainage of the country induced by use and improvement, or by artificial structures bringing water from sources whence it could not be brought in any other way.

12—102 ILL.

4.  SAME—*nature and extent of the rights of riparian proprietors as to the water of a running stream.*   There can be no property merely in the water of a running stream.   The owner of land over which a stream of water flows, has, as incident to his ownership of the land, a property right in the flow of the water at that place for all the beneficial uses that may result from it, whether for motive power in propelling machinery, or in imparting fertility to the adjacent soil, etc.—in other words, he has a *usufruct* in the water while it passes;—but all other riparian proprietors have precisely the same rights in regard to it, and, apart from the right of consumption for supplying natural wants, neither can, to the injury of the other, abstract the water, or divert or arrest its flow.

5.  Such being the character of the right of riparian proprietors in the water of a running stream, it matters not how, in the first instance, the water became running water, for if it were raised by wells, or brought out of reservoirs, the moment the waters thus produced are allowed to flow into a natural stream, and mingle with its waters thence on towards its mouth, over the soil of another, the rights of the lower riparian proprietors attach.   Or where the natural flow of water in a running stream is augmented by any artificial means the same result will follow.

6.  And where water is thus brought into a running stream, the principle is not restricted to the more remote riparian proprietor, but is equally applicable to those who are proximate to the party causing the artificial addition to the waters.

7.  SAME—*as to the right of reclamation of abandoned waters.*   So where an individual has by artificial means brought water into a running stream in such manner that the rights of lower riparian proprietors over whose lands the commingled waters may flow, will attach, then the moment such waters enter upon the land of another the party causing the artificial addition will be regarded as having abandoned the water so produced by him, and placed it beyond his right of legal reclamation or control.

8.  And this doctrine applies notwithstanding the attempted diversion may be of only the same quantity of water which the person seeking to reclaim it may have added to the volume of the stream, or even a less quantity.   It matters not, in this view, what proportion of the water which his acts contributed to the stream, he seeks to divert from a lower proprietor, so that the fact remains that the water so contributed by him had become intermingled with the water of the stream and passed upon the land of another.

9.  ACTION—*liability as between two persons whose acts conjointly produce the result complained of.*   Where a person had wrongfully diverted water from a running stream, to the injury of a lower riparian proprietor, and after having carried the water to a point at which it would be wholly unavailing to such lower proprietor, permitted it to be used as a motive power for propelling machinery by another to whom he leased the right, it was *held*, the act of each was the act of both, so that the lessee who made use of the water was held liable as for the original diversion.

APPEAL from the Appellate Court for the Second District;—
heard in that court on appeal from the Circuit Court of
Will county; the Hon. JOSIAH McROBERTS, Judge, presiding.

This was an action on the case, by appellee against appel-
lant, for diverting the water in the Desplaines river from the
plaintiff's mill.    There was a 'plea of not guilty, with notice
of special matter, embracing the evidence relied upon in
defence.    Judgment was rendered in the circuit court for
appellant, and from this an appeal was taken to the Appel-
late Court for the Second District, and that court reversed
the judgment of the circuit court, and entered judgment for
appellee for $800, and costs of suit.    The present appeal is
from that judgment.

Upon the trial in the circuit court the following was stipu-
lated to be the evidence:

"That the plaintiff, at the time of the commencement of
this suit, was possessed, as the owner, of lots 1, 2, 3 and 4,
in block 45, and lots 1, 2, 3, 4, 5, 6, 7 and 8, in block 57, and
lots 1, 2, 3, 4 and 6, in block 62, all in the School Section
addition to Joliet, in Will county, Illinois, said addition com-
prising the whole of section 16, town 35, range 10 east, third
principal meridian, and that said plaintiff and his grantors
have been in possession of said premises continuously since
the year 1852, and prior thereto, and that said grantors to
plaintiff were Philo A. and Orlando H. Haven; that said
premises are located on the Desplaines river, a natural water.
course running through said section 16; that a dam, herein
called Adam's dam, is and has been standing across said
river since prior to the year 1852, and that said premises
have been used continuously to the date of trial by plaintiff
and his grantors for mill purposes, deriving the power there-
for from said Desplaines river; that said plaintiff now, and
for many years, has located on said premises mills propelled
by water power derived from said river, and has, and had at

the date of the diversion of water complained of, located on said premises six wheels, four of which are in place to be used, and which are reasonably fitted to use the water in the river, and do not require to put them in use any unreasonable detention or employment of the water flowing in said river; that the location of said premises, with reference to the Illinois and Michigan Canal and the Desplaines river, in the city of Joliet, is correctly shown by the map marked 'A,' which it is not deemed necessary to reproduce here, and that the location and course of the Desplaines river and the Illinois and Michigan Canal, from the north line of sections 22 and 23, in town 35 north, range 10 east (being the town of Lockport), to the south line of section 16, town 35, range 10 east (being the town of Joliet), with the locks, levels and dams of said canal in said distance, the dam of said Adam, and the structure of said defendants on said canal below Adam's dam, are correctly shown by the map marked '13,' to be sent up with this record, but which it is not deemed necessary to reproduce here; that said canal was opened for navigation in the spring of the year 1848; that the Summit division of said canal terminates at Lockport, Illinois, on section 23, town 36, range 10, and was improved by the city of Chicago so as to make a continuous level, drawing water from Lake Michigan, from the terminus of the south branch of the Chicago river to lock No. 1, aforesaid, under the act of the General Assembly of date February 16, 1865; that said improvement was completed about May 1, 1871; that the State of Illinois, by act of the General Assembly, assumed charge of said improved level in the year 1871, by act of date October 20, 1871, and has since controlled the same; that from dam No. 2, in Joliet, south, the canal level is known as the Channahon level; that all the water which is put into said level for any purposes is drawn from the pool formed by dam No. 2, at Joliet, above plaintiff's dam, and since the building of said canal, and its opening in 1848, until the

completion of the structures of defendants, no water had ever been drawn from said level or had been put into the same, except as required for navigation purposes, nor had any water power been used or leased on said level; that there is more water introduced into the Summit level of said canal by reason of the improvement known as the deep cut, above referred to, than is required for navigation purposes, and more than is required for the purposes of the canal between locks 1 and 2, 2 and 3, and 3 and 4, on said canal, between Lockport and Joliet; that the use of such surplus water is leased to Norton & Co., at Lockport, so far as they may require, and the balance is discharged by a spillway,—both the water used by Norton & Co. and that discharged by said spillway being conducted by a race, from the hydraulic basin connected with the canal, to the Desplaines river, at a point in section 23, in said town, and from thence mingled with the other water of said river, follows the bed of said stream through sections 22, 23, 27 and 34, in the town of Lockport, and partially through section 3, in the town of Joliet, to a point where said canal effects a junction with said river; that from said point in section 3 aforesaid, where said junction is made to dam No. 2, in Joliet, said canal is contained within artificial banks or walls of stone, but comprises the original bed of said river, using the same, and leaving said river at dam No. 2; that there is a mill site and mill on said river, section 23, in Lockport, and had been for many years, and that from the point on section 23 where said surplus water is discharged, to the point on section 3, in Joliet, where the canal enters into the bed of said river, there is no connection between said canal and said river, and no structures, works or improvements of any kind were ever placed on said river, or any control exercised over the same by any canal authorities, or the State, for any purpose; that said waste-weir is never used except in case of high water and floods, or when it is necessary to draw off the water from the level for the

purpose of repairs, there usually being no more water than is utilized at Norton's mills; that the amount of water which is discharged into the Desplaines river at Lockport, from the Summit division of said canal through said spillway and Norton & Co.'s race, is about 25,000 cubic feet per minute; that the amount of water required for navigation purposes on the canal from lock No. 1 to dam No. 1 is about 1220 cubic feet per minute; that the amount of water required for navigation purposes of said canal from dam No. 1 to the end of the Channahon level is about 3300 feet per minute, and the amount required for navigation purposes on the Channahon level alone is about 2800 cubic feet per minute; that since the completion of the said deep cut, and the turning of such surplus water into said river at Lockport, the amount of water flowing over Adam's dam at Joliet, before the diversion of the water herein complained of, was greater by two-thirds, as estimated, than the amount flowing over said dam prior to said deep cut improvement, and that the amount of water passing over Adam's dam since the diversion complained of, is double the amount which passed over said dam before the completion of the deep cut; that the season during which said canal is open for navigation on said Channahon level is generally from March 25th to November 25th, in each year; that defendants' premises are located on the berme or western bank of said canal, on said Channahon level, about half a mile south-west of plaintiff's dam; that defendants built a tunnel under said canal, put in water wheels, and at the date of commencing said suit had been drawing water from said Channahon level of said canal to the extent of from 6000 to 8000 cubic feet per minute to operate their mill, discharging the same into the Desplaines river below the plaintiff's dam, and at a lower level on said river than said dam, so that the use of said water was wholly lost to plaintiff; that but for the diversion of said water from the pool above dam No. 2 of the Illinois and Michigan Canal into the Channahon level of

said canal, and for such use by defendants, all of said water would have naturally flowed in the banks and bed of said river to said plaintiff's dam and water wheels, and could have been used by him; that such use of said water from said canal by said defendants is by virtue of a lease for such purpose, executed to said defendants by the Canal Commissioners of the State of Illinois; that said mill of defendants, and said structures for using said water, had been in use at the date of the trial about two years, and that plaintiff could have used and had machinery wherewith to use all water so used by said defendants, and that the damage to plaintiff is from $800 to $1000 per annum; that plaintiff's damage to date of trial, is from $1600 to $2000; that the course of said canal is as originally laid out and completed in 1848; that said Philo A. and Orlando H. Haven, the plaintiff's grantors, while in possession of said premises, commenced suit against the trustees of the Illinois and Michigan Canal, about the year 1848, to recover damages for the diversion of the Desplaines river into said canal and away from said dam, and that said suit is the identical one referred to and decided in the 5th Gilman Reports, page 548, and in the 11th Illinois Reports, page 554, and is of and concerning the same dam that plaintiff is now in possession of; that before final judgment in said last named suit, and on, to-wit, the 22d day of August, A. D. 1853, an agreement in writing was executed between said Philo A. and Orlando H. Haven, of the one part, and said trustees of the Illinois and Michigan Canal, of the other part, in words and figures as follows, to-wit:

"'Whereas, a suit has been, and is now, pending, at the instance of Philo A. Haven and Orlando H. Haven, against the Board of Trustees of the Illinois and Michigan Canal, in the circuit court of Will county, Illinois, in consequence of alleged damages to a certain mill owned by said Philo A. Haven and Orlando H. Haven, situated on the Desplaines river, at Joliet, Will county, Illinois, occasioned by diverting

the water of said river from said mill, and applying it to the use of the Illinois and Michigan Canal above said mill; and whereas, the said board of trustees and the said Philo A. Haven and Orlando H. Haven being mutually desirous of avoiding further litigation:

·    " 'Therefore, we, the said Philo A. Haven and Orlando H. Haven, for and in consideration of the sum of $3060 to us paid by the said Board of Trustees of the Illinois and Michigan Canal, the receipt whereof is hereby acknowledged, do hereby release and forever discharge the said board of trustees, and their successors in office, from all actions, rights of action, and all claim arising out of any damages heretofore, now, or hereafter to be sustained by us by reason of the use of the waters of said Desplaines river for the purpose of supplying said canal, in the manner the same is now supplied at the feeder at Joliet. In further consideration of the said sum of $3060, herein expressed to have been received by us, we hereby remise, release, and forever quitclaim to the board of trustees and their successors in office, and to the State of Illinois, whenever said canal shall revert to said State, the right to use and appropriate the water of the said Desplaines river at the feeders at Joliet, below guard lock No. 1, for supplying the said canal for the purpose of navigation, in the same manner the water in said river, in connection with other feeders, is now used for supplying said canal.

"  'We further agree that when, at any time, the superintendent or other person having charge of said canal shall desire to reduce the quantity of water above our said mill-dam for the purpose of repairing said canal, its banks or other appurtenances, at any point between our said mill and the dam across said river at said feeder, that said superintendent, or other person having charge of said canal, may reduce the water above said mill-dam, provided the water at our said mill-dam shall not be reduced lower than the top or comb of our said mill-dam, which may be done by opening

the waste-ways at the west end of said mill-dam, which shall be closed by said superintendent as soon as said repairs can be completed, and shall not be opened except for such repairs as aforesaid, nor remain open more than for the period of one week at any one time, without such compensation as may be agreed upon by any two persons to be selected by us for that purpose.

"'We further agree to dismiss all suits now pending at our instance against said board of trustees in the circuit court of Will county, Illinois, and pay all costs of court that may remain unpaid at the time said suit or suits shall be dismissed.

"'In witness whereof the said Philo A. Haven and Orlando H. Haven have hereunto set their hands and seals, this 22d day of August, 1853.

PHILO A. HAVEN,   [Seal.]<br>
By O. Haven, his attorney in fact.  [Seal.]<br>
ORLANDO H. HAVEN.'  [Seal.]

"And that the sum of money mentioned in said agreement was paid and receipted for, said receipt being in words as follows:

"'$3060.

"'Received, Lockport, Aug. 22, 1853, from David Leavitt, treasurer, for the Board of Trustees of the Illinois and Michigan Canal, by the hands of William Gooding, secretary, the sum of $3060, in full, on settlement of our claim for damages against the Board of Trustees of the Illinois and Michigan Canal.

PHILO A. HAVEN,<br>
By O. H. Haven, his attorney in fact.<br>
O. H. HAVEN.'

"It is further agreed, that no evidence proving, or tending to prove, any other facts than as herein stated and referred to, to-wit: certain maps, was offered by either party on the trial of said cause; that the evidence offered was offered by

each party hereto, subject to such material objections thereto, except for matters of form, as might be made; that this statement of the proofs and of the facts proved herein shall stand as, and be signed by the court and filed in this cause as, a proper and sufficient bill of exceptions in this case, and that no other or further one shall be required, but that nothing herein stated shall (should a re-trial be had of this case or of any other) prejudice the rights of either party to introduce on such trial further, other, or different evidence proving or tending to prove any different fact or facts.

"It is further agreed, that on such evidence and proof, the said court, wherein said action was pending and tried, found the issues herein for the defendants, to which finding said plaintiff excepted, and moved for a new trial in the said cause, which motion was by said court overruled, and thereupon said court rendered judgment against said plaintiff and in favor of said defendants, for costs; and inasmuch as the matters and things do not appear of record, he tenders this as his bill of exceptions herein, and prays that the same may be signed and sealed, and made part of the record in this case."

The case is properly certified from the Appellate Court, and the certificate, after embodying a finding of facts embracing the foregoing stipulation, and the conclusion and judgment thereon, presents the following questions as being involved:

*First*—Under the facts in this case, are the defendants below liable for the diversion of the water, as charged.

*Second*—Under the facts, has the plaintiff below the prior right to the use of the 25,000 cubic feet per minute turned into the Desplaines river through the gates and spillway at Norton's mill, at Lockport.

*Third*—Can this action be maintained against defendants below, they being lessees of the Canal Commissioners.

*Fourth*—Under the facts of this case, which of the parties to this record has the prior right to the use of the 25,000 cubic feet per minute turned into the Desplaines river through the gates and spillway at Norton's mill, at Lockport.

*Fifth*—Have the Canal Commissioners a right to take into the canal from the Desplaines river, above the plaintiff's dam, any more water than they need for the purpose of navigation on the canal.

*Sixth*—Have the canal authorities, under the contract between the canal trustees and the Havens, the right to take water from said river above plaintiff's dam, use the same for mill power on said Channahon level, and deprive the plaintiff of the use of the same by turning the water, after it is so used for water power, into said river below plaintiff's dam.

*Seventh*—What is the proper construction of the contract between the canal trustees and the Havens, and are the parties to this suit bound by said contract.

*Eighth*—Under the law applied to the facts found, what are the rights of the plaintiff in and to the waters flowing in the channel of said river.

The errors assigned bring before the court all the questions involved in the rulings below.

Mr. E. F. BULL, and Mr. G. D. A. PARKS, for the appellant:

A lower riparian owner on a natural water course is entitled, and only entitled, to receive from the proprietor above, the proper, natural and customary flow of the stream, unimpaired in quantity and in the conditions of fall necessary to make it reasonably useful to him. Angell on Water Courses, sec. 95, *et seq; Plumleigh* v. *Dawson*, 1 Gilm. 544; *Evans* v. *Merriweather*, 3 Scam. 492.

This doctrine is expressed in the maxim of the civil law, "*aqua currit et debet currere, ut currere solebat.*" *Belknap* v. *Belknap*, 2 Johns. Ch. 463.

The proper, natural and customary flow of water in a natural water course must be defined, in general terms, as that body of water which issues from its natural sources and affluents in the water shed that it drains. Angell on Water Courses, sec. 4, *et seq.*

As to the rights of dominant and servient proprietors: Angell on Water Courses, sec. 5; *Buckingham* v. *Smith*, 10 Ohio, 288; *Trustees, etc.* v. *Dickinson*, 9 Cush. 547; *Brace* v. *Yale*, 10 Allen, 443; 2 Bouvier's Inst. 174; *Whittier* v. *Cocheco Manf. Co.* 9 N. H. 454; *Society for Manf.* v. *Morris Canal Co.* Saxton, (N. J.) 157; *Butte* v. *Vaughn*, 11 Cal. 143; *Burnett* v. *Whitesides*, 15 id. 35; *Elliott* v. *Fitchburg R. R. Co.* 10 Cush. 191; *Embury* v. *Owen*, 6 Exch. 360; 2 Washburn on Real Prop. 329; *Hoffman et al.* v. *Stone et al.* 7 Cal. 46.

The appellant did not divert the water,—that was the act of the canal trustees. *Parker* v. *Griswold*, 17 Conn. 288.

Messrs. GARNSEY & KNOX, for the appellee:

There is no property in the water of a water course. The only property right is, the right to the use of the water as it passes through or by each owner's land. 3 Kent, side p. 439; Angell on Water Courses, sec. 95; *Evans* v. *Merriweather*, 3 Scam. 492; *Batavia Manf. Co.* v. *Newton Wagon Co.* 91 Ill. 239; Washburn on Easements, p. 214, sec. 9, and p. 216, sec. 11.

The property in a stream of water is regarded as indivisible. Each riparian owner is bound to use it as an entire stream in its natural channel, for a severance would destroy the rights of all. One proprietor can not so appropriate or use the stream as materially to injure others jointly interested in it. *Havens* v. *Canal Trustees*, 11 Ill. 557; *Plumleigh* v. *Dawson*, 1 Gilm. 544.

A lower riparian proprietor has the right to the use of all water which may be added to a stream by a higher proprietor, and it matters not that the addition was made at the entire

expense of the upper proprietor.  *Tourtelotte* v. *Phelps*, 4 Gray, (Mass.) 376 ; *Webb* v. *Portland Manf. Co.* 3 Sumner, 189 ; *Swindon Water Works* v. *W. and B. Canal Co.* 14 Moak's English R. 86 ; *Batavia Manf. Co.* v. *Newton*, 91 Ill. 239.

The right to the use of the water flowing in the natural channel of a water course is property, being either a corporeal or an incorporeal hereditament, according to circumstances.  Angell on Water Courses, sec. 90 ; *Havens* v. *Canal Trustees*, 5 Gilm. 548.

It is a matter of indifference, so far as the rights of the lower proprietor are concerned, from what source, whether natural or artificial, the waters of the stream are derived.  *Wood* v. *Ward*, 3 Exch. 779 ; Washburn on Easements, 298.

The contract in this case does not give the right to the grantees to divert more water, or a greater amount, or in a different manner, than is allowed by its express terms.  *Bealey* v. *Shaw*, 6 East, 208 ; *Taylor* v. *St. Helens*, 22 English R. (Moak's ed.) 796 ; *Blackmore* v. *Glamorganshire Canal Co.* 1 Mylne & Keene, (7 Eng. Ch.) 155 ; *Jeneson* v. *Walker*, 11 Gray, 423.

For the purpose of showing how similar deeds or grants of riparian rights have been construed, we cite the following additional cases :   *Lincoln* v. *Lincoln*, 110 Mass. 449 ; *Davenport* v. *Lamson*, 21 Pick. 73 ; *Richardson* v. *Bigelow*, 15 Gray, 423 ; *Sibley* v. *Hoar*, 4 id. 222 ; *Strong* v. *Benedict*, 5 Conn. 210 ; *Darlington* v. *Painter*, 7 Barr, 473 ; *Schuylkill Nav. Co.* v. *Moore*, 2 Whart. 477.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court :

Appellee is owner, by grant from Philo A. and Orlando H. Haven, of the property, the water rights upon which were the subject of litigation in *Canal Trustees* v. *Haven*, reported in 5 Gilm. 548, and, when again before this court, in 11 Ill. 554.   Whatever water rights affecting that property they could convey, he owns.  Appellant's right to draw water

from the canal to propel his machinery, is derived from a lease, executed many years subsequent to 1852, by the Board of Canal Commissioners,—who are successors in trust to the Board of Trustees of the Illinois and Michigan Canal. Possession by appellee and his grantors of the property conveyed by them to him is admitted to have been continuous since 1852, and prior thereto. The possession, respectively, of the board of trustees and of the Havens was, therefore, upon well established and familiar principles, notice of the rights claimed by each to all dealing thereafter with either; and inasmuch as their respective rights were materially affected by their agreement of the 22d of August, 1853, the parties to the present suit, in acquiring their rights, were bound to know what that agreement was, and hold subject thereto. This is not seriously contested in argument, and, in our opinion, it can not be.

The inquiry then naturally arises, at the threshold of the case, to what extent did that agreement affect and change the rights of the parties in regard to the use of water at the place involved in this controversy? The agreement recites the pendency of the suit by the Havens against the board of trustees for the recovery of damages alleged to have been sustained to their mill in consequence of the diverting the waters of the Desplaines river "from said mill, and applying it to the use of the Illinois and Michigan Canal, above said mill," and that the parties were anxious to avoid further litigation. The Havens do, therefore, and for the consideration then specified as being paid, thereby "release and forever discharge the said board of trustees, and their successors in office, from all actions, rights of action, and all claim arising out of any damages heretofore, now, or hereafter to be sustained by them by reason of the use of the waters of said Desplaines river for the purpose of supplying said canal, in the manner the same is now supplied at the feeder at Joliet;" and they also, in further consideration of the said

sum specified as then paid, thereby "remise, release, and forever quitclaim to the board of trustees, and their successors in office, and to the State of Illinois, whenever said canal shall revert to said State, the right to use and appropriate the water of the said Desplaines river at the feeder at Joliet, below guard lock No. 1, for supplying the said canal for the purpose of navigation, in the same manner the water in said river, in connection with other feeders," was then "used for supplying said canal." It had been decided by this court in that suit, that the Havens were riparian proprietors to the center thread of the stream, and, as such, entitled to recover for any diversion of the water to their injury, (5 Gilm. *ubi supra,*) and also that the property in the water was indivisible, each proprietor being bound to use it as an entire stream, in its natural channel, in such way as not materially to injure others who were jointly interested in it. (11 Ill. *ubi supra.*)

The Havens, therefore, might have persisted, in the enforcement of their right to have the stream continue to flow as an entire stream, in its natural channel, as it had, before the diversion, been wont to flow, or they might relinquish this right in favor of the board of trustees, either wholly or partially. They chose to relinquish the right partially. The board of trustees were only empowered to obtain water for the purposes of navigation, although, as incident to getting rid of waste or surplus water, they might, doubtless, sell water power. See Angell on Water Courses, sec. 468; *Cooper* v. *Williams,* 5 Ohio, 391; *Buckingham* v. *Smith,* .10 id. 288. And therefore it is to be presumed it was that they only sought to obtain from the Havens, and the Havens only purported to relinquish to them, the right to use this water for the purpose of navigation. It is manifest it was understood that this purpose would not, at all times, require all the water flowing in the river, and that at such times it was not intended the board of trustees should have the right to appropriate the water to any different or new use, for they

expressly limited the right to use the water for navigation, "in the same manner the water in said river, in connection with other feeders, was then used for supplying said canal." The release of damages, also, is of those sustained "by reason of the use of the waters of said Desplaines river for the purpose of supplying said canal, in the manner the same is now supplied at the feeders at Joliet." So, beyond all question, any use of the water in a different manner from that in which the water in the river was then used for supplying the canal, is unauthorized by the relinquishment, and so, unaffected by it. Plainly, a use in excess of that needed for navigation, creating a motive power for the benefit of others, is a use not within the language or the spirit of the agreement.

It is, however, argued, with much ingenuity and plausibility, that the agreement does not contemplate the addition to the waters of the river since caused by the deepening of the Summit level of the canal, but only such water as naturally flowed in the river without the aid of art. But does it, by fair construction, exclude such addition? We think not. No word is used expressing whence or how it is anticipated the flow of water is to be obtained. The language is, simply, "the water of the Desplaines river." What that language embraces they intended—nothing more, nothing less. It is not to be presumed that the parties intended only the stage of the water then in the river, or the stage of water that might be brought in by the system of drainage then in use, for it is clear the design was to effect a permanent settlement of the controversy, and it was known the country was then new and but imperfectly drained, and that enlarged and more perfect drainage would be gradually introduced as the country grew older and became better improved, and hence there would be produced, from time to time, a material change in the volume and flow of the water in the river. The parties knew the position and possibilities of the river, not only in respect of the water that naturally flowed into it, but also

in respect of its future use as an outlet for drainage, and it
would, therefore, seem not unreasonable that they should, in
the absence of anything showing the contrary, be held to
have had within contemplation its possible use for all the
purposes, and to the extent, to which it has since been ap-
plied.

A reference to the well settled legal principles applica-
ble to running waters will, we think, satisfactorily show
that the waters introduced into the Desplaines river by
the deepening of the Summit level of the canal, thereafter
became, in a legal sense, and hence within the language of
the agreement, "waters of the Desplaines river." The law
has been long settled, in this State, that there can be no
property merely in the water of a running stream. The
owner of land over which a stream of water flows, has, as
incident to his ownership of the land, a property right in the
flow of the water at that place for all the beneficial uses that
may result from it, whether for motive power in propelling
machinery, or in imparting fertility to the adjacent soil,
etc.,—in other words, he has a *usufruct* in the water while it
passes ; but all other riparian proprietors have precisely the
same rights in regard to it, and, apart from the right of con-
sumption for supplying natural wants, neither can, to the
injury of the other, abstract the water, or divert or arrest
its flow. *Evans* v. *Merriweather*, 3 Scam. 492 ; *Plumleigh* v.
*Dawson*, 1 Gilm. 544 ; *Havens* v. *Canal Trustees*, 11 Ill. 554 ;
*Batavia Manf. Co.* v. *Newton Wagon Co.* 91 id. 230. See,
also, 2 Blackstone's Com. (Sharswood's ed.) 17 ; 3 Kent's
Com. (8th .ed.) 544 ; Washburn on Easements, 207, *et seq.;*
Goddard's Law of Easements, (Bennett's ed.) 56 ; *Embrey
et al.* v. *Owen*, 4 Eng. L. & Eq. 466.

It would seem, when it is once established, that the only
property right recognized by the law, as respects running
water, is in its use as it passes along and as incident to the
soil over which it passes,—it could make but little difference

13—102 ILL.

how, in the first instance, the water became running water, for if it were raised from wells, or brought out of reservoirs, the moment the individual thus producing it should allow it to flow into a natural stream, and mingling with its waters thence on towards its mouth, over the soil of another, he would have voluntarily placed it beyond his power of legal reclamation or control; for, without becoming a trespasser upon the soil of that other, or obtaining a license from him, he could then do no act to arrest its onward flow, or divert its course, or in anywise enjoy its use. It would, in our opinion, be conclusive evidence of an abandonment of all right to enjoy the use or control the movement of such water. The principle is broadly stated in text books, but does not appear to have been often the sole point in controversy, though frequently as incidentally and pertinently before the court in adjudicated cases.

In Goddard's Law of Easements, (Bennett's ed.) p. 51, the author says: "When a stream is natural, there can be no doubt that all waters which flow into it become a part of that stream, and subject to the same natural rights as the rest of the water, and that it makes no difference that the water so flowing to the natural stream was sent down by artificial means."

In Washburn on Easements, p. 274, sec. 33, it is said: "There are some cases where a lower mill may acquire the benefit of expenditures laid out by the upper mill owner, without being liable to contribute therefor. Thus, if the owner increases the capacity of the stream, for mill purposes, by enlarging the extent of his pond, or the reservoirs which supply his mill, the lower one has a right to avail himself of the benefit of this, as something incident to the ownership and situation of his mill."

In Angell on Water Courses, sec. 95, the author says: "It is also important to observe, that as each proprietor through whose land a water course passes, has a right to

the natural flow and descent of a water course, subject to a
like reasonable use by all others, he necessarily enjoys the
benefits in the improvement made by proprietors above.    If
they increase the head waters, for useful purposes, by flowing
increased areas of land, and by making reservoirs to preserve
surplus water for dry seasons, and thus increase the volume
of water for hydraulic purposes, every lower proprietor neces-
sarily enjoys the benefit of it."

In *Wood* v. *Waud*, 3 Exchequer, (Welsby, Hurlstone &
Gordon,) 748, one of the questions occurring upon the trial
was, whether the plaintiffs had a right to the waters of
"Bowling sough," and in reference thereto, POLLOCK, C. B.,
in delivering the opinion of the court, said: "Have the
plaintiffs a right to the waters of this sough, as described in
the third count of the declaration? It appears to us to be
clear, that as they have a right to the use of the Bowling
beck, as incident to their property on the banks and bed of
it, they would have the right to all the water which actually
formed part of that stream as soon as it had become part,
whether such water came by natural means, as from springs,
or from the surface of the hills above, or from rains or melted
snow, or was added by artificial means, as, from the drainage
of lands, or of colliery works; and if the proprietors of the
drained lands, or of the colliery, augmented the stream by
pouring water into it, and so gave it to the stream, it would
become part of the current,—no distinction could then be
made between the original natural stream and such acces-
sions to it.".

In *Webb* v. *The Portland Manf. Co.* 3 Sumner, 189, a sug-
gestion was made in argument that the defendants had fully
indemnified the plaintiff from any injury, and in truth had
conferred a benefit on him, by securing the water, by means
of a raised dam higher up the stream, at Sebago pond, in a
reservoir, so as to be capable of affording a fuller supply in the
stream in the dryest season.    But STORY, J., in delivering

the opinion of the court, in reply to this, said: "To this suggestion several answers may be given. In the first place, the plaintiff is no party to the contract for raising the new dam, and has no interest therein, and can not, as a matter of right, insist upon its being kept up, or upon any advantage to be derived therefrom. In the next place, the plaintiff is not compellable to exchange one right for another, or to part with a present interest in favor of the defendants at the mere election of the latter. Even a supposed benefit can not be forced upon him against his will, and certainly there is no pretence to say, that, in point of law, the defendants have any right to substitute for a present existing right of the plaintiffs any other which they may deem to be an equivalent. The private property of one man can not be taken by another, simply because he can substitute an equivalent benefit." See, also, Cooley on Torts, to the same effect, p. 66.

In *Tourtelotte et al.* v. *Phelps*, 4 Gray, 370, it was held a grantee of land, including the site of a dam, with the privilege of flowing, during the winter only, the meadow of the grantor higher up on the same stream, "for the benefit of carrying on the blacksmith's business," has the right, as against his grantor, or those claiming under him privileges above or below on the same stream, to use, at all seasons, for any reasonable purpose, the waters of the stream, including any additional power subsequently created by improvements of his grantor; and in discussing this question the court, per SHAW, Ch. J., said: "One consideration is important to the present inquiry. It is this: that as each proprietor through whose land a water course passes, has a right to the natural flow and descent of a water course, subject to a like reasonable use by all others, he necessarily enjoys the benefit of any improvements made by the proprietors above him. If they increase the head waters, for useful purposes, by flowing increased areas of land, and by making reservoirs to preserve surplus waters for dry seasons, and thus increase

the volume of water for hydraulic purposes, every lower proprietor necessarily enjoys the benefit of it.    *    *    * ·Indeed, where several successive mills are to be benefited by a reservoir at the head of the stream, it is common for the several proprietors to come into an agreement to contribute proportionally to the expense of an improvement which will inure to their common benefit.   But in such case, if the lower mill owner pays anything for the benefit he enjoys, it is in virtue of the obligation he has entered into, and not of any duty incumbent on him by law."   Like doctrine was announced by this court, in argument, in *Batavia Manf. Co.* v. *Newton Wagon Co. supra.*   To like effect see, also, *Eddy* v. *Simpson*, 3 Cal. 249.

The principle thus recognized is not restricted, as seems to be supposed by counsel for appellant in argument, to the more remote riparian proprietor, but is equally applicable to those who are proximate to the party causing the artificial addition to the waters, and this will be obvious when it is reflected that intermingled waters become indistinguishable and inseparable, and the right to flowing water is not a right in the water itself, but simply a right to its use as it flows, as an incident to the ownership of the soil over which it passes, and so the party causing the artificial addition has as effect-ually abandoned all right to use and control it, the moment he has caused or permitted it to commingle with other waters and flow upon the land of another, as he has after permitting it to flow continuously over the soil of numbers of successive proprietors, and to become commingled with the waters of many additional streams.   Whether sooner or later, the moment he has placed the water beyond his right of legal reclamation or control, he has, in a legal sense, abandoned it, and it is, thereafter, to him only as any other running water.

Counsel for appellant quote and rely upon *Elliott* v. *Fitch-burg R. R. Co.* 10 Cush. 191, *Whittier* v. *Cocheco Manf. Co.*

9 N. H. 454, *Society for, etc. Manf.* v. *Morris Canal Co.* Saxton, (N. J.) 157, *Hoffman et al.* v. *Stone et al.* 7 Cal. 46, *Butte* v. *Vaughn,* 11 id. 143, and *Barnett* v. *Whitesides,* 15 id. 35, as establishing the doctrine that if a party take out and divert from a stream of water the same amount (or less than that) which he has, by artificial means, before caused to flow into it, a lower riparian proprietor will have no right of action against him on account of such abstraction or diversion.

The following quotation from the opinion of the court in *Elliott* v. *Fitchburg R. R. Co.* 10 Cush. 191, very clearly shows the ground of the opinion there: "The question was not (if the defendants have caused damage to the plaintiff amounting in law to a disturbance of his right, for which an action would lie,) whether it would be barred by an advantage of equal value conferred, in the nature of a set-off, but whether, the improvements of Clark upon his meadow taken together as a whole, including the dam and ditches as a part of one and the same improvement, any damage was done to the plaintiff; and this, we think, was correctly so left to the jury."

In *Whittier* v. *Cocheco Manf. Co.* 9 N. H. 454, the plaintiff had granted to another party, who had subsequently granted to the defendants, certain lands and water power on the south side of a dam across the Cocheco river, at a place called Waldron's Falls, reserving to himself the right to draw water from the pond above the dam for fulling cloths and skins. The defendants also owned the lands and certain mills at the north end of the dam, and in addition thereto certain other mills, lower down, on the same river, and it seems, moreover, they had been in the habit of using and withdrawing water at the north end of the dam for manufacturing, in some certain and definite manner, for more than twenty years, and thus acquired a prescriptive right in that regard. The defendants, and others, had collected,

through artificial means, water in a reservoir, called Bow pond, above Waldron's Falls, which they could there let into the river by means of a gate. In a dry time they opened their gate at Waldron's Falls and also at Bow pond, and thus permitted the water to pass below. Plaintiff claimed there was a diversion of water to his injury. The court held that the right plaintiff retained in the water above the dam at Waldron's Falls, was subject to the prior right of the defendants, as mill owners, on the north side of the river, to use the water as they, and those under whom they claimed, had used it for more than twenty years before the acquisition of his right,—that it could make no difference to him whether the defendants used the water to propel machinery at Waldron's Falls, or let it pass through their gate without any use there, in order that it might be used at their mills below, provided they did not thus withdraw from the pond more water than they were entitled to withdraw for propelling their machinery, had they chosen to have used it at Waldron's Falls for that purpose, and that plaintiff had no right to require that the defendants should shut down their gates for the purpose of saving, for his use, the water let into the river from Bow pond. What became of the water after it passed out of the pond and beyond the dam in which plaintiff had an interest, was clearly of no consequence to him. The question was, simply, was he entitled to require that the defendants should collect that water and retain it for his use,—and the reservation in his grant, and other circumstances fixing his rights, answered in the negative. That case is plainly, and, as we conceive, vitally, distinguishable from the present case, in that there, by express contract, the plaintiff's rights to the use of the water above the dam were subordinate to and restricted by the prior rights of the defendants, and those under whom they claimed, to use that water as they had used it for more than twenty years before the acquisition of his right, whereas, here, the plaintiff is, by contract,

restricted in his right to the use of the water of Desplaines river only in so far as it may be necessary for purposes of navigation. Had the plaintiff in that case been in nowise restricted in his right to use the waters of the river above the dam for manufacturing purposes, a very different question, as we conceive, would have been presented.

In *The Society for Establishing Manufactories, etc.* v. *Morris Canal Co.* Saxton, (N. J.) 157, bill was filed for the purpose of restraining the defendants from diverting the waters of the Passaic river. The defendants claimed the privilege of introducing into the Rockaway (the bed of which, for a distance, they make use of for the bed of their canal,) the waters of Lake Hopatcung and of one of the branches of the Raritan, and then of taking out of the Rockaway, below, so much water as may be necessary for the purposes of their canal, averring that the waters of the stream will be thereby in nowise diminished. The Chancellor refused the injunction. It will be noted there was in that case but a single enterprise, in which the turning of the waters of Lake Hopatcung and the branch of the Raritan into the Rockaway, and the diverting of the waters of the Rockaway into the canal, were concurrent acts, and necessary parts of one common whole. They were each for the purpose of supplying the canal with water. So far as the Rockaway was used, either for the reception or diversion of water, it was as a part of the canal. There could, therefore, be no ground for claiming that by turning the waters of Lake Hopatcung and the branch of the Raritan into the Rockaway, the canal company had abandoned them. Directly the reverse seems to have been true. At all times it retained actual and lawful control of these waters.

It is unnecessary that we should express any disapproval of these cases at this time. Whether rightly or wrongly decided, they do not assert that he who causes a body of water, which he has collected by artificial means, to flow into

a natural stream of water, retains a property right in, or
ownership of, that water after it has passed on to the soil of
another, nor do they assert that one trespass to the property
of an individual may be justified by another and wholly inde-
pendent trespass beneficial to that individual. This would
be contrary to natural justice, and subversive of the funda-
mental principles of property rights. I may not justify my
act of tearing down my neighbor's inclosure, and destroying
his crops, by showing that, unsolicited, and of my own voli-
tion, I dug ditches and removed obstructions to cultivation
on his lands, whereby I benefited him more than I injured
him by tearing down his inclosure and destroying his crops.
But these cases, in principle, go no farther than to assert
that where, by the accomplishment of a single and entire
work, water is both added to and diverted from a stream, a
lower riparian proprietor can not complain, provided the
same amount and quality of water shall continue to flow to
him after as before. The work is regarded as a single act,
and its ultimate result, in that view, whether injurious or
beneficial, is alone considered. This view is, however, mani-
festly inapplicable in an action at law, where the party adding
the water, in a legal point of view, abandons it, so that the
lower riparian proprietor has a legal right, technical though
it may be, to have the added water flow down over his land
as a part of the waters of the stream; for no common law
doctrine is settled more firmly by the concurrent judgments
of common law courts, than that for every distinct invasion
of a right, although the invasion itself may be productive of
no actual injury, some damage is presumed. See Cooley on
Torts, 64, 65 and 66, and notes there cited, and opinion of
Story, J., in *Webb* v. *Portland Manf. Co. supra.*

The California cases are not applicable. They hold, con-
trary to what we have shown is the law here, that there may
be an ownership in the water of a flowing stream. Thus, in
*Hoffman* v. *Stone*, 7 Cal. 49, Mr. Ch. J. Murray said: "The

fact early manifested itself that the mines could not be successfully worked without a proprietorship in waters, and it was recognized and maintained. To protect those who, by their energy, industry and capital, had constructed canals and races, carrying water for miles into parts of the country which must have otherwise remained unfruitful and undeveloped, it was held that the first appropriator acquired a special property in the waters thus appropriated, and as a necessary consequence of such property might invoke all legal remedies for its enjoyment or defence." There is no pretense in any of those cases, as counsel seem in argument to suppose, that the ownership of the waters is affirmed upon common law principles, but, as appears from the foregoing quotation, it was because of the peculiar circumstances and necessities existing in that country. And this is still more fully shown and explained in the opinions of the court, by Field, J., in *Atchison* v. *Peterson*, 20 Wall. 507, *Basey et al.* v. *Gallagher*, id. 670, and *Jenison* v. *Kirk*, 98 U. S. (8 Otto,) 453. See, also, *Irwin* v. *Phillips*, 5 Cal. 140; *Davis* v. *Gale*, 32 id. 26.

The remark of the court in *Hoffman* v. *Stone, supra,* referred to by counsel, in regard to framing rules conforming, as nearly as possible, to the analogies of the common law, has reference to the protection of rights already ascertained and defined, and not to the ascertainment and definition of rights in waters, and as illustrative of this, the court, in cases where waters of different owners become mingled in the same channel, applied the common law doctrine in regard to the confusion of goods of equal value. (*Butte Canal Ditch Co.* v. *Vaughn,* 11 Cal. 151.) This was not the common law doctrine, because in such case, the common law recognizing no property right in the water, there could be no property confused upon which the rule could operate. But holding, as the court there did, that from the peculiar circumstances and necessities of that country there should be property

rights in running waters, it was very logical to frame and apply this rule according to the analogies of the common law, as was done.

The facts in the present case are plainly distinguishable from those in each of the cases referred to by counsel for appellant. The stipulation shows that there is more water introduced into the Summit level of the canal, by reason of the improvement known as the "deep cut," than is required for navigation purposes, and more than is required for the purposes of the canal between locks one and two, two and three, and three and four, on said canal, between Lockport and Joliet; that the use of such surplus water is leased to Norton & Co., at Lockport, so far as they may require, and the balance is discharged by a waste-weir, both the water used by Norton & Co. and that discharged by said waste-weir being conducted by a race into the Desplaines river, and mingling with its waters at that point. After the water passes into the Desplaines river, the mingled waters, for near the distance of three miles, pass over soil owned by parties other than the State, or canal trustees or commissioners, among whom is the owner of a mill, at which these waters are used, a short distance below Lockport, and there is, for that distance, no connection between the canal and the river, and no structures, works or improvements of any kind were ever placed on the river, or any control exercised over the same, by the canal authorities or the State, for any purpose. So, it is quite clear, at no point within that distance could the State or the canal authorities do any act in regard to this water. At the mill it is as completely beyond their legal power of control as are the waters of the Mississippi. It is quite true the owner of the mill and the other riparian proprietors have no legal right to exact that this water shall be discharged into the river; but when it is discharged into the river, by virtue of the character it then assumes as running water in a natural stream, and their position as lower riparian

proprietors, they are lawfully entitled to the same use and benefit to result from it that they are from any other water of the stream.

If it were not for the fact that the canal, at Joliet, uses the waters of the Desplaines river, there could certainly be no question but that those controlling the canal had completely abandoned the waters discharged into that stream at Lockport. Yet suppose there had been no agreement between the Havens and the canal trustees allowing the trustees to use the waters of the river at that place, those waters must have been permitted to flow on in their natural channel, and, necessarily, with them the waters added at Lockport from the Summit level. Those operating the canal acquire their rights at Joliet, not because of ownership in the water coming down the stream, but because of the riparian rights of the State at that place, and the agreement with the Havens. It is the fact, alone, of riparian ownership that puts them in a position to obtain a lawful use of the water there, and it is the agreement that authorizes them to arrest its flow and confine it within the banks of the canal,—and this, as has been seen, is limited to purposes of navigation.

The deepening of the Summit level, and the cutting of the tunnel, and doing of the other work enabling appellant to withdraw water from the canal to propel his machinery, were not concurrent acts, nor parts of a single improvement. The acts were disconnected in point of time, and disconnected in purpose. Appellant's water power was obtained by him from the Board of Canal Commissioners long subsequent to the deepening of the Summit level, and, for aught that is disclosed in this record, it was not even thought of while that work was in progress, nor until some time after its completion.

The position of counsel that it is shown that one of the purposes of the deepening of the Summit level was to procure water to be leased as motive power, as a source of revenue by those in charge of the canal, is, as we think,

based upon a misapprehension.    The agreement with the
Havens, it has been seen, shows, at least, that at that time
the creation of such water power was not in view, and the
stipulation of the parties discloses no such fact.    The act of
April 16, 1865, under which the city of Chicago deepened the
Summit level, discloses no such purpose.    It shows that, so
far as the city of Chicago was concerned, the sole purpose
was to purify or cleanse the Chicago river.    It is true, it is
therein shown that it was desirable to cut down the Summit
level, so as to draw a large supply of water from Lake Mich-
igan; but this was not for motive power, but is expressly
said to be "for navigation."    Indeed, it has been held by
this court, in an action on the case against the city of Chi-
cago for negligence in prosecuting the work of deepening the
Summit level, wherein the defence was interposed that the
city was the agent of the State in executing a public work
for the public benefit, and that it could not therefore be
liable, that the city was not the agent of the State, but
acting simply, under legislative authority, in a matter that
concerned its own interests,—namely, the preservation of the
health of the city.    It was said:    "The facts stated in the
preamble to the act of 1865, show conclusively that this
enlargement of the canal was a suggestion of the city of
Chicago, and recommended for the only purpose of cleansing
their river, which had become, by reason of having no cur-
rent, a nuisance.    The act of 1865 bears on its face the
impress of benefit to Chicago, and nothing more.    That was
the moving cause, as we infer, for the passage of the act.
The city was in no sense the agent of the State."    (*Joney
v. Chicago,* 60 Ill. 383.)    And this was followed and ap-
proved in *The City of Chicago* v. *McGraw,* 75 Ill. 566.    Of
course, the State is benefited by the act, and the property—
water power and all—is its property.    But this would seem
to effectually answer the argument sought to be drawn from
the assumed purpose of deepening the Summit level.

It may be quite true that appellee has now more water than he had before the deepening of the Summit level, and that, contrasting his condition now with his condition then, he is not injured; but he is entitled, by virtue of his position as lower proprietor, as has been shown, to the benefit of all improvements whereby the flow of the water in the river is increased, and this property right can not be taken from him without his consent. The right which the lower riparian proprietor has to avail himself of all benefits resulting from improvements by upper riparian proprietors, is obviously a property right, growing out of the nature and necessities of flowing water and his position upon the stream, and of which, therefore, he can no more be deprived, without his consent, than of any other property right. In brief, the lower riparian proprietor has a legal right to profit from the necessities of the upper proprietors, and of this he can not be deprived without his consent, and so his relative condition with and without regard to the upper improvements does not, necessarily, control or affect the question of damages. And the rule is, where a riparian proprietor is deprived of his right, the law will imply a damage to him, and entitle him to nominal damages, at least, and therefore an action may be maintained in such case without proof of actual damages. *Plumleigh* v. *Dawson, supra; Parker* v. *Griswold,* 17 Conn. 288.

Counsel for appellant make the point that the water is carried by the Canal Commissioners beyond a point at which appellee could possibly derive any beneficial use from it before it is diverted to the use of appellant, and hence contend that the act of diversion, to appellee's injury, is the act of the Canal Commissioners, and in no legal sense the act of appellant. The facts admitted by the stipulation are: "That defendant's premises are located on the berme or western bank of said canal, on said Channahon level, about half a mile south-west of plaintiff's dam; that defendants

built a tunnel under said canal, put in water wheels, and at the date of commencing said suit had been drawing water from said Channahon level of said canal, to the extent of from 6000 to 8000 cubic feet per minute, to operate their mill, discharging the same into the Desplaines river below the plaintiff's dam, and a lower level on said river than said dam, so that the use of said water was wholly lost to plaintiff; that but for the diversion of said water from the pool above dam No. 2 of the Illinois and Michigan Canal into the Channahon level of said canal, and for such use by defendants, all of said water would have naturally flowed in the bank and bed of said river to said plaintiff's dam and water wheels, and could have been used by him." It thus appears that the act of appellant in using said water directly contributed to prevent the water from naturally flowing within the banks and bed of the river to appellee. Moreover, it is stipulated appellant's use of said water is by virtue of a lease from the Canal Commissioners, so it is quite apparent, as respects this diversion, the acts of each are the acts of all. The water is brought down to appellant by his procurement, and therefore the act of bringing the water to the point where it runs into his tunnel is, constructively, his act.

It was not competent for the State to take rights belonging to appellee and transfer them to appellant, (Cooley's Const. Limitation, 530,) and what the State, through its agents, could not do, it could not authorize appellant to do. The lease was void, and can therefore form no justification for the act of appellant. Angell on Water Courses, sec. 468; *Cooper* v. *Williams, supra; Buckingham* v. *Smith, supra; Varick* v. *Smith,* 5 Paige, 136.

Perceiving no error in the record, the judgment below is affirmed.

*Judgment affirmed.*