H. P. CROWELL

v.

WILLIAM M. DRULEY.

</div>

1. TITLE—COLOR NOT LOST BY TAX DEED TO ANOTHER PARTY.—Color of title is not lost by virtue of a tax deed issued by the sheriff to another party.

2. STATUTE OF LIMITATIONS.—The Statute of Limitations under the twenty year clause having begun to run against any person before his death would continue against any of his heirs, notwithstanding they might be minors.

3. SPECIFIC PERFORMANCE.—The court finds in this case that the title to the lots contracted for, although not deducible from the government, is good beyond reasonable doubt, and affirms the decree for specific performance.

ERROR to the Circuit Court of Will county; the Hon. J. McROBERTS, Judge, presiding. Opinion filed June 8, 1886.

This was a bill in equity commenced in the circuit court January 31, 1884, by the defendant in error against the plaintiff in error, for the purpose of compelling the specific performance of a contract, the subject of which was the sale of real estate therein named, from defendant in error to the plaintiff in error.

The contract bore date March 24, 1883, by which defendant in error covenanted and agreed to sell and convey to plaintiff in error, Henry P. Crowell, by proper deed of conveyance, with full covenants of warranty free and clear of all liens and incumbrances whatsoever, the following described real estate in the city of Joliet, Will county, Ill.; the description of the real estate and the contract being as follows :

"Lots No. (2 and 3) two and three, in block (107) one hundred and seven, and lots No. (7 and 8) seven and eight, in block (98) ninety-eight, and lots No. (4, 5 and 8) four, five and eight, in block No. (99) ninety-nine, all in school section addition to Joliet, excepting and reserving therefrom the real estate now actually occupied by a feed mill located on said property; and convey also all the right, title and interest of whatsoever nature of the late firm of Druley & Johnson, in and to that part of Shelby street in said city of Joliet, lying between Pleasant street and the Des Plaines river, and also that part of Pleasant street in said city of Joliet from the center of Jasper street to the west bank of the Des Plaines river, whether obtained by way of reversion or otherwise. Such conveyance to be made, executed and delivered on or before the first day of January, A. D, 1884, or as soon as the said party of the first part, by proper legal proceedings, can convey or cause to be conveyed, the title, right and interest to the heirs of his deceased partner, late William

F. Johnson, in and to said above described real estate. The property hereby intended and contracted to be conveyed being the oat meal mill property of the late firm of Druley & Johnson, located at city of Joliet, aforesaid, together with all the machinery, tools, rights, privileges and appurtenances properly pertaining to said mill property; and also said Druley's leasehold interest in feed mill hereinbefore excepted, including extension of track, if awarded.

"In consideration whereof the said party of the second part agrees to pay to the party of the first part the sum of twenty-five thousand dollars ($25,000), in the manner following: Five hundred dollars ($500) at the date hereof, forty-five hundred dollars ($4,500) upon the surrender of possession or tender of possession of the said party of the first part, twenty thousand dollars ($20,000) upon the tender of proper conveyance for said property. All deferred payments to be payable with and bear interest at the rate of six (6) per cent. per annum, and all payments to be made at the office of the party of the first part. in the city of Joliet, Will county, Illinois.

"It is mutually agreed that the said party of the first part shall surrender to the said party of the second part the possession of said property at any time on demand after the first day of April, 1883, and the said party of the second part shall take possession of said property on or before the first day of May, A. D. 1883, and the said deferred payment of forty-five hundred dollars ($4,500) with interest, shall be due and payable in any event, whether possession is taken or not, on the said first day of May, 1883.

"It is further mutually covenanted and agreed, that time and the prompt performance of all the covenants and agreements herein contained to be kept and performed by the said party of the second part constitute the essence of this contract, and in case of default by the said party of the second part, in all or either of the covenants herein by him agreed to be kept and performed, then in that case this contract may be declared forfeited and at an end at the election of the said party of the first part, and all payments made on account hereof forfeited to the party of the first part, and the party of the first part

shall be entitled to the immediate possession of said property; or the said contract, at the election of the said party of the first part, continue in force, and the said party of the first part at liberty to collect all money hereby agreed to be paid, in any legal manner.

"It is further agreed that this contract shall extend to and be obligatory upon the heirs, legal representatives and assigns of the several parties hereto.

"In witness whereof the said parties hereto hereunto set their hands and seals, the day and year first above written.

<div style="text-align:right">

"WILLIAM M. DRULEY, [SEAL]

"H. P. CROWELL, [SEAL]"

</div>

The bill shows that on or about the first day of May, 1883, the plaintiff in error paid the sum of $4,500 on the contract and went into possession of the property, and that he and those claiming under him had remained in possession ever since; that the plaintiff in error, Crowell, a short time before the said first day of May, with other persons, organized a corporation under the general laws of the State, known as the "Joliet Meal Co.," with the design that the company when fully organized should take the assignment of the contract from Crowell and take possession of the real estate and operate the oatmeal mill and ultimately acquire the title; that on or about the fourth of May, the said Crowell assigned the contract to the corporation and turned over the possession to the corporation, and from that time had operated the said mill as an oat meal manufacturing establishment, the said Crowell being president of the company; that the said company had assumed to carry out the contract on the part of the said Crowell. The bill shows that the said real estate belonged to and continued assets of the late firm of Dudley & Johnson; that prior to the execution of the contract, said Wm. F. Johnson had died, and that at the date of the execution of the contract defendant in error was in the possession of the said real estate as the surviving partner of the late firm of Dudley & Johnson, of which facts the said Crowell was advised; that thereafter defendant in error exhibited his bill of complaint in the circuit court against the heirs of the said

Crowell v. Druley.

Johnson, among other things setting up the execution of the said contracts and praying for a confirmation of the same and for authority to make conveyance of the said property thereunder, and to convey the title of all the heirs of the said Johnson, and that a cross-bill was filed making the said Crowell a party defendant, and that afterward, at the September term, 1883, of said circuit court, a decree was entered in the original suit, confirming the said contract and authorizing the defendant in error to convey said real estate as prayed for, exhibiting a copy of the decree.

The bill further shows that at the time of the execution of the contract, the lot was then incumbered by a mortgage of $5,000, of which said Crowell was fully advised, and that at the time of the execution of the contract, it was understood between the parties thereto, that the mortgage should be paid out of the purchase money. That within a few days after the entry of the said decree and prior to the first day of January, A. D. 1884, he advised said Crowell that he was ready to make conveyance as agreed, and assign the water lease upon the payment of the purchase money, or part of the purchase price remaining unpaid, and advised him that the said real estate was clear of all incumbrance except the said mortgage, and that the said mortgage, the notes secured thereby, and a proper release of the mortgage, remained in the First National Bank of Joliet, ready for delivery upon the payment of the money due thereon, with six months' interest, and that defendant in error desired to pay such sum out of the purchase money, but if Crowell insisted on it, he would take up said mortgage and have it released in advance of the payment, and that said Crowell then stated he need not do it, that the amount of the mortgage could be taken out of the purchase money, and that the title could be made to him or the oat meal company, when made as defendant in error might elect, and that he, Crowell, would determine after further examination, whether he would take the title; that soon after said Crowell and the oat meal mill company refused to take the title to said real estate. The bill charges that the value of the real estate has been impaired by changes

made in the machinery by Crowell, and that valuab'e machinery had been removed from the mill. That defendant in error, in order to save the water lease from the Illinois and Michigan canal, had been obliged to pay the rent, said Crowell refusing to do so. The bill alleges a willingness to perform the contract as well as the ability, and that said Crowell and the Joliet Oat Meal Company, allege that they are also willing and ready to perform in case defendant in error could make a good title to the premises, but that he could not do so, and therefore refused to take the title. And defendant asked the aid of the court to compel specific performance on the part of said Crowell, he refusing to perform on his part. The Oat Meal Company answered, disclaiming any right, claim or interest in the lots, mill or contract, and is out of the case. Plaintiff in error also answered, admitting the contract, the payment of a portion of the purchase money, and the being put into possession of a part of the premises, to-wit, the lots, but not the portions of the streets mentioned in the contract, or the railroad track or extension. He also puts in a disclaimer as to the Oat Meal Company having any interest in the lots or mill, or that the contract was assigned to it. Admits that defendant in error and Wm. F. Johnson were joint owners of the property, but disclaims knowing whether they owned it as partners. Admits the proceedings in the chancery suit and that a decree was obtained, requires the defendant in error to establish its validity, claims that defendant in error's title to the property in question was not good, and that he was so advised by his counsel, and that on the first day of January, 1884, defendant in error was duly informed in writing by authority of plaintiff in error, that he could not accept the conveyance from the defendant in error, and declines to accept the same as the title was found to be bad, and refused to pay any portion of the purchase money. Denies that defendant in error ever tendered a deed, or any assignment of the water lease, and denies that he ever waived any such tender as a condition precedent to the payment of the purchase money. Denies that defendant in error prior to 1st day of January, 1884, had

Crowell v. Druley.

title to any part of said property, or had the power or ability to convey the same by good and sufficient warranty deed, etc., as the contract provided. That the foundation of the defendant in error's title was tax title, and that he had no valid patent title to any of the lots on the 1st of January, 1884. That defendant in error had conveyed away certain portions of the streets, agreed to be conveyed to plaintiff in error, and that before 1st January, 1884, he had notice of it; that the streets were of great value, and that defendant in error never had any title thereto, and knowingly misrepresented the facts; that without the consent of plaintiff in error, defendant in error had made a new arrangement with the canal commissioners for water power and new wheel to be put in the mill, which change was not contemplated by the contract. Admits possession up to January 1, 1884, but denies changes in machinery, etc. Admits he refused to pay the water rent, because he could not get a good title to the property. Upon hearing, a decree of specific performance against plaintiff in error was rendered in favor of defendant in error.

The plaintiff in error makes these points in his brief, among other things, for reversal, to wit: The defendant in error can not show a patent title deducible from the government, and insists that the title should be deducible of record. Upon a hearing of the case, the defendant, who had the affirmative, under ook to show that he had a good title to all the lots, the title to which he had agreed to convey, free and clear of all incumbrances, by showing he had color of title, and that it was good as against the true owner, by means of an acquired bar, under the seven years limitation act of 1839, and also the twenty years limitation act, except as to lot 2, block 107, to which he claims a perfect title, as well as the bar; the claims of defendant in error, and the objections of the plaintiff in error, are presented in the following manner: 1st. As to lots 7 and 8, in block 98, in school section addition to Joliet, defendant claims color of title by deed from the auditor of accounts of the State of Illinois, of date of January 13, 1846, to Martin H. Demmond, being a tax deed, and claims the transfer of this color to him as follows: 1st. By will of M. H. Dem-

mond to Sophia Demmond, two thirds, and to Catharine M. Murray, one third; admitted to probate August 14, 1854. By quit claim deed from Catharine M. Murray to Sophia Demmond, February 1, 1855. By quit claim deed from Sophia Demmond to August Grassman, August 19, 1856; by deed from August Grassman, bachelor, to Conrad Grassman and Mary A., his wife, November 17, 1859; by deed from Conrad Grassman and Mary A., his wife, to August Grassman, July 24, 1866; by deed from August Grassman and wife to Henry S. Carpenter and F. E. Marsh, July 18, 1877; and by deed from the said Carpenter and Marsh and wives to Walter Ford and Robert S. Slater, August 4, 1878; by deed from Walter Ford to Robert Slater, May 7, 1879; by deed from Robert Slater and wife to Wm. L. Druley, May 22, 1879; by quit claim deed from Wm. L. Druley and wife to Robert P. Slater, July 16, 1879; by deed from Robert Slater and wife to Wm. M. Druley, July 17, 1879; again by another deed from Robert Slater and wife to Wm. M. Druley, October 9, 1880. Wm. M. Druley conveyed an undivided half of these lots, as well as the others in question, to Wm. F. Johnson, his partner in the oat meal business, which, after the contract was entered into which the bill is brought to enforce, the circuit court, upon bill filed by Druley against Johnson's heirs, ordered Johnson's heirs' interest to be conveyed to plaintiff in error under the contract.

By way of payment of taxes, it is claimed and shown that Martin H. Demmond paid all the taxes assessed on the lots from the date of his deed, 1846 to 1854, inclusive. The evidence shows that even prior to the year 1855 the said lots were vacant and unoccupied. That August Grassman, in 1857 or 1858, took possession of the lots, and lots 4, 5 and 8 in block 99, and erected a dwelling house on lot 8, block 98, the house resting partly on the lot and partly on the street, and that he and those claiming under him continued such possession up to the commencement of this suit, and are still in possession, and that the said Grassman quarried out all the merchantable stone on the lots. That Grassman, and those claiming under him, lived in the dwelling house and held actual possession for

fifteen years consecutively. It is urged that defendant in error has a claim of the twenty years bar under the twenty years limitation act, as well as under the seven years bar, under the statute of 1839. August Grassman paid the taxes whilst in actual possession for more than seven years.

Against this claim of title it is urged by plaintiff in error that the payment of taxes made by Demmond failed to inure to the benefit of defendant in error because the title failed to pass from Demmond by virtue of the want of proper proof of the will of Demmond. The tax sale record shows a tax sale of all the lots to Charles Werner, in 1873, for city taxes and hence a break in the chain from that date. It is claimed that after the stone quarry was worked out in 1871, to the time the lots were occupied by the railroad track and scales in 1878, they were vacant and unoccupied. But the evidence fails to show that Grassman ever abandoned possession of the lots after the stone was quarried out, and Carpenter & Marsh took possession in July, 1877, the date of their purchase, as Marsh testifies. It is further urged that the deed from Catharine M. Castleberry, *nee* Murray, was not properly acknowledged; that the deed from Catharine Murray to Sophia Demmond, did not locate the lots as in the school section addition to Joliet. It is claimed that a certain tax deed from the city of Joliet to defendant in error, September 8, 1870, was improperly conveyed by the mayor and clerk of the city to defendant in error, they having no such power, and that the city council could not ratify the act. To further make the title clear under the bar, the defendant proved that Charles Reed was the patentee from the State of Illinois, July 2, 1836, and the evidence fails to show that he ever divested himself of the title, and that Robert Stevens became the patentee to lot 8, in block 98, from the State, July 2, 1846, and that Stevens was never divested of the title, and the evidence shows that said Reed remained in the State till 1863, and that Stevens remained in the State till his death, and that neither of them was under the disability mentioned in the act of 1839. As to lot 3, in block 107, the defendant in error claimed good title by means of the bar of the Statute of Limitations, as follows: 1, by virtue of a tax

deed from the sheriff of Will county to Rodney House, etc., April 25, 1856, which is claimed as color of title.   The said House and wife conveyed his title to the said Carpenter & Marsh above named, June 1, 1874.   The said Carpenter & Marsh conveyed the same to said Ford & Slater April 4, 1878, and defendant in error is shown to deduce title through Ford & Slater.   Prior to June 1, 1874, this lot was vacant and un-occupied.   That Carpenter & Marsh, upon their purchase, took immediate possession and continued in possession until the conveyance of the property and such possession has been continued to the time of the commencement of this suit.   It is claimed that House paid all the taxes on the said lot each year consecutively from 1860 to 1872, both inclusive, being twelve continuous years; that after taking possession as aforesaid said Carpenter & Marsh and their grantees paid all the taxes assessed for more than seven consecutive years.   Thus a bar was created under each of the 8th and 9th sections of the seven years limitation act of 1839, and at the date of decree the limitation under the twenty years act had run.   It was shown that Charles H. Reed was the patentee for this lot July 2, 1836, and it nowhere appears that he divested himself of his title, and that he lived in the State till his death, in 1863, and that he was under none of the disabilities named in the act of 1839.   The objections raised to this title were that House had lost his color of title; could gain nothing by the payment of taxes for the reason that his title had been supplanted by another tax title acquired in 1858 by another party; that Henry Law paid the taxes of 1865 (Ab. 47); that the lot was vacant from 1874 to 1877, then that Carpenter & Marsh owned it.   But this appears to be a misapprehension, as Marsh swears that they were in possession.   Assuming that the lot was vacant during the time that Carpenter & Marsh owned it, there would not be a complete bar under either section of the statute, 1839 up to 1882, when the lot was sold for taxes.

As to lot 5 in block 99, the deed from S. O. Simmons and wife to August Grassman of Sept. 17, 1857, is claimed to be valid color of title.   As to lots 4 and 8 in block 99, the deed from John Frederick and wife through mesne conveyance of

Crowell v. Druley.

Myron K. Branson to August Grassman of date of July 5, 1853, leaves the title to lots 4, 5 and 8 in B. 99 in August Grassman. He took actual possession of these lots in 1857. That he and those claiming under him maintained that possession to the time of the commencement of this suit, and all the merchantable stone not quarried out by him between 1864 and 1871. Since 1871 the said Grassman and his grantees have paid all the taxes assessed on these lots, making more than seven consecutive years. This it is claimed creates a complete bar under the 9th section of the act of 1839, as to the three lots, except so much of lots 4 and 5 in B. 99 as is occupied by Railroad street. The bar of twenty years limitation is also claimed.

Mark Beaubien entered lots 4 and 8 in B. 99, from the State, July 2, 1836, and so far as the proofs show never conveyed. Mark Beaubien resided in the State till 1869, when he died, and was not under any legal disability named in the act of 1839. Martin H. Demmond entered lot 5, block 99 (this lot not being worth over $50), April 3, 1835, from the State, and never parted with the title. He resided in the State till 1854, when he died, leaving no heirs, but making a will of all his real estate to Sophia Demmond and Catharine Murray. Neither he nor either of his devisees was under any disability named in the statute. As against each of these parties the statute commenced to run and was complete before their death, except Maria Demmond, as to lot 5, and as to that the proof shows that Sophia Demmond and Catharine Murray, now Castleberry, are still living and not under disability.

The objections made by plaintiff in error as to the claimed bar as to these lots, are: Lots 4 and 8, block 99, were conveyed by the sheriff to Myron K. Branson for taxes 1839, July 18, 1844. The deed from Myron K. Branson and wife to Micajah L. Adams of said lots 4 and 8, was objected to on the grounds of insufficient description of lots and defective acknowledgments; description being "to-wit, lots 4 and 8, in block 99, in school section, T. 35, R. *11*, E., Joliet" should be "Sec. 1 )." This locates the section six miles east of the city, and is not a good description as is claimed. Upon examination

of the certificate the objection to it appears not to be well taken. . The deed offered from Micajah Adams and wife to John Frederick has the same defective description, as is claimed, as the one above last set forth, except the county and State is not in the description. The date of the deed is July 1, 1856. This deed is not acknowledged or witnessed and is not admissible. To cure this deed from Micajah Adams and wife, above described, a deed from the same grantor of date of January 2, 1884, to Wm. Druley, of said lots 4 and 8, is introduced in evidence. The next deed from John Frederick and wife to August Grassman, dated July 15, 1856, is objected to on account of insufficient acknowledgment, but no special exceptions pointed out and the acknowledgment not being abstractive the acknowledgment must be regarded as good.

The conveyance of S. O. Simmons of lot 5, B. 99, by quit claim deed to August Grassman, September 16, 1857, is objected to as color of title because Simmons had firstly only purchased a portion of the lot at tax sale, and second, had never received a tax deed for it. Lot 8, B. 99, was sold to S. Goodspeed, for taxes of 1854, and not redeemed or deeded, and was forfeited to the State for taxes of 1857 and sold to Charles Werner for city taxes of 1873. Plaintiff makes the same objection to the payment of taxes for 4, 5 and 8, B. 99, as is made to payment in 7 and 8, B. 98, that is, lots 4, 5 and 8, B. 99 came to Grassman in 1864 or 1865, and he occupied and quarried stone from the lots till 1871. In 1871, N. W. Bannon had the lots bid in for taxes, and Werner redeemed for Grassman. (This seems to be correct.) It is claimed that the lots became vacant in 1871 and remained so till 1878 till the railroad was extended on lot 7, block 98. (The claim that because Grassman quit quarrying stone in 1871, that therefore the lots became vacant till the railroad track was extended or until Carpenter & Marsh took possession can not be allowed under the evidence.)

As to lot 2 in block 107, the defendant in error claims that he has an absolute fee simple title from the general government derived through the State of Illinois, it coming to the State by an act of Congress. Jonathan Smith became the

patentee from the State on July 2, 1836. Then Jonathan Smith conveyed to Jonathan Y. Scammon on April 5, 1836. Jonathan Y. Scammon conveyed an undivided one third to Richard J. Hamilton, July 29, 1836, and also the other undivided one third to Solomon Wills, July 30, 1836. Then Richard J. Hamilton and wife and J. Young Scammon and wife, April 12, 1837, convey the entire lot to Solomon Wills. Then Lucy L. Wills, Matilda M. Wills, William R. Lakeman and wife, Mary E. Lucy Wills, widow, heirs at law of Solomon Wills, deceased, by Ellen D. Wills, their attorney in fact, and Ellen D. Wills, legatee, conveyed to G. A. D. Parks, February 22, 1868. The power of attorney is shown Ellen D. Wills, February 12, 1868. Afterward, said Parks conveys to Slater & Druley, and then defendant in error by deed from Slater becomes vested with title.

The objections urged by the plaintiff in error to the sufficiency of title are as follows : The lot was forfeited to the State for taxes for 1840, and was sold to M. H. Demmond for taxes of 1840 and again for 1843, and was sold to Giles Heath for city taxes of 1850, and to Harvey Law for taxes of 1862, and to M. Maher for taxes of 1865, and to Wm. Gusson for taxes of 1882. The certificate of acknowledgment to the deed from Smith to Scammon, April 5, 1836, is objected to because it has no seal, being taken by recorder of court, record of deed being offered, the seal shown in abstract not being in record as is claimed. It appears that the deed was acknowledged in the State of Pennsylvania before David L. Storm, Clerk of Cambria County Court, the same being a court of record ; this is in the certificate and the acknowledgment is signed by him as recorder. The record of the deed from J. Y. Scammon to Hamilton, above set forth, is objected to for the reason it is claimed that Hamilton, the grantee, took the acknowledgment of the deed himself. The record of the power of attorney from the Solomon Wills heirs is objected to on account of the want of the certificate of the secretary of state of Illinois which was not attached to the certificate of acknowledgment of the commissioner of deeds who took the acknowledgment, resident in the State of Kentucky, dated February 12, 1868. (Statute of

1851 required it, 2 Sess. Laws 143, not repealed till February, '57, laws '69 makes change in it—and the power and deed are objected to for this reason.)    The deed from Parks to Slater & Druley only conveys one fourth of the title for this reason, and because no title passed from Smith to Scammon, or from Scammon to Hamilton.    There could be no bar on account of the payment of taxes for three reasons: 1.    Because the lot was vacant and unoccupied from June, 1874, to 1878, that is from the time Carpenter & Marsh purchased from Howe till they sold to Ford & Slater.    It is claimed that actual possession commenced with Ford & Slater.    Therefore payment of taxes from 1874 to 1881, inclusive, could not avail to create a bar, for payment of taxes partly under one section and partly under the other of the statute of 1839, can not be joined in order to make out the seven years, and the lot was sold for taxes of 1882.

Mr. S. W. RANDALL, for plaintiff in error.

Messrs. HOUSE & FRY, for defendant in error.

LACEY, P. J.    The first important inquiry is, had the defendant in error such a title as he agreed to convey—that is, a warrantable title, free and clear of all liens and incumbrances. It is not claimed by defendant in error that he can show a title deducible from the United States, the source of all land titles, or one that is deducible of record except, perhaps, as to lot 2 in B. 107, mentioned in the contract.    His claim is that he has a title by limitation based on such firm foundation that there can exist no reasonable doubt of its validity and superiority to all titles that come against it.    Such a title he is compelled under the law to make out as to each of the seven lots named in his contract, because the contract is a unit.    To an examination of the question as to the validity of his title we will address ourselves.    We will first examine the question of possession, leaving the other questions involved to be considered afterward.

As the question of limitations to an important extent arises

under sections 8 and 9 of the limitation law of 1839, the inquiry becomes important as to whether the lots were vacant and unoccupied or in actual possession of the party claiming the color of title at the time of the payment of the taxes by the holder of such color as well as the particular period at which actual possession was taken of the several lots.

The first inquiry will be as to those conditions. There is some dispute between counsel for the respective sides over these points. There are seven lots in question and actual possession was taken of those lots at different periods. But first it is agreed until 1855 all the lots were vacant and unoccupied, and that no one had ever been in actual possession up to that time, of either of the lots. The main point of dispute as to taking and continuing possession is as to what was the condition subsequent to that time.

Lots No. 2 and 3 in B. 107 were taken possession of at a different period than that of the occupancy of the other lots, 7 and 8 in B. 98 and 4, 5 and 8 in B. 99. First we will inquire as to the possession of the first named lots. These two lots were conveyed by Rodney House to Carpenter & Marsh on the 1st day of June, A. D. 1874. Prior to that time the lots were vacant and unoccupied and ever had been. Frank E. Marsh testifies that he was a member of the firm of Carpenter & Marsh and was acquainted with the lots. "We bought the whole block of Rodney House, I think, in 1874. We went into possession at the time of the purchase, I think in the spring of 1874; continued in possession until 1878, then sold to the firm of Ford & Slater. They began at once erecting the oat meal mill, the one on it now. Prior to the purchase it ( the block ) was vacant and unoccupied." " While we held it, our possession was not questioned, or our title objected to." This was substantially all the evidence on the disputed point of possession from 1874 to 1878 of these lots. It is insisted by counsel for plaintiff in error that this is not sufficient proof of " actual possession." There should have been labor or expenditure of some sort shown. The word possession implied actual possession. It is a legal term known to the law and implies certain acts, as is claimed, and " those

acts should be proven." This witness was allowed to testify that they went into actual possession, and so remained without any question or objection. He swore to a fact, the fact of possession, without being cross-examined, in order to bring out the particular facts. The court could but take his testimony as he gave it—and we must be satisfied with it. No evidence was given to contradict it. We then hold that there was actual possession of these lots by Carpenter & Marsh from the 1st of June, 1874, till 1878, when they were sold to Ford & Slater, and that such possession has continued ever since.

As to the other five lots mentioned it is claimed that August Grassman was in actual possession from and after 1857 or 1858, and we find on the evidence of Werner, that to be a fact. The only evidence we find is the testimony of Charles Werner, who testifies: "During all the time from 1864 to 1871 Grassman occupied those five lots and quarried stone on them; I think they (Grassmans) built a house there in 1857 or 1858. They lived there all the time till he sold, in 1878 or 1879." * * * " The quarry was on all five of the lots, and they built a house in 1857 or 1858, three fourths in the street and one fourth on the lot—not quite three fourths, about one third on lot 8, block 98, and two thirds in the street. I never knew of Grassman's rights and interests being questioned or attacked."

It is claimed under this testimony by plaintiff in error that Grassman abandoned the actual possession of the lots in 1871, because he had worked out the stone quarry, but we fail to see any evidence of this fact, nor can we see that this is a legitimate deduction from the evidence. Besides this, Grassman held his house on one of the lots, which was possession of itself of at least that lot, and as the house had been used for the benefit of the quarry, without further evidence the house and improvements would hold possession of all. Therefore we must hold that actual possession continued on these five lots from 1857 or 1858, till the decree was rendered herein.

The next question then is, had the defendant in error color of title and payment of taxes for the requisite number of

Crowell v. Druley.

years, or had he twenty years actual and uninterrupted pos-
session.     As to lots 7 and 8 in block 99, we find that Mar-
tin H. Demmond, under whose title defendant in error claims,
had a tax deed from the auditor of state of Illinois, dated Jan.
13, 1846.   The defendant in error became connected with
this title, by regular conveyances through different intermedi-
ate holders, and so held the title at the time his deed was ten-
dered to plaintiff in error, and the time of the final decree.   The
proof shows also that Demmond paid all the taxes assessed on
these lots from the year 1846 to the year 1855, both inclusive,
a period of ten years.   This was while these lots were vacant
and unoccupied, thus creating a complete bar under the 8th
section of the statute of 1839, and it had been complete some
thirty-nine years prior to the time the decree was rendered
herein.   Besides this, the actual possession of these lots was
taken by Grassman, he building a house on one of them, lot
7, in 1857 or 1858, and that the lots have been in possession
ever since.   This would also create a complete bar under the
statute of twenty years prior to the decree.

Stevens and Reed, the respective patentees of the lots in
1836, died in this State, and neither of them was under any
of the disabilities named in the act.   We think that the time
that the limitations had run in regard to this lot, and the long
and uninterrupted possession of these lots, would render the
title morally certain and secure.   Nor can we see any objec-
tion that can arise to the introduction of the will of Martin H.
Demmond.   The will, the affidavits attached, and the order of
the county court admitting it to record, were shown, and this
is all that is required.   The sale in 1873, of the lots, for city
taxes, could avail nothing, as it has never ripened into a
deed.   The objection that the deed from Catharine Castle-
berry, *nee* Murray, to Sophia Demmond, did not properly lo-
cate the lots, is not well taken.   However much objection
there could be to the description, the deed has been corrected
by subsequent conveyance to defendant in error by Catharine
Castleberry; and as to the acknowledgment, we see no fault
with it.   We think the deed conveying the tax title of the
city of Joliet, by the mayor and clerk of the city, and being

subsequently ratified, would be sufficient to convey any title the city had; besides, this deed seems to have been void for want of a valid judgment or precept.

As to the title of lot three in block one hundred and seven, color of title is to be found in Rodney House, by tax deed from the sheriff of Will county, dated April 24, 1856. Rodney held this title till June 1, 1874, when he sold it to Carpenter & Marsh, who took immediate and actual possession of it, but up to that time it remained vacant and unoccupied.

It appears from the evidence that House paid all the taxes on said lot for each consecutive year from 1860 to 1872. It is claimed by plaintiff in error that Harvey Law paid the taxes for 1865, but we find no evidence of that fact, even if the record showed, which we think can not be claimed, that the lot was assessed in Law's name; yet George S. House testified that he paid the State and county tax on it for Rodney House for 1865. The objection that he lost the color of title by virtue of another tax deed from the sheriff to another party, is not well taken. Color is not lost by the occurrence of such fact. Carpenter & Marsh, and those claiming under them, paid the taxes each year, from 1874 to 1882, when the lot was sold for taxes. This makes over seven consecutive years payment of taxes on this lot while it was in actual possession. This creates a bar both under the 8th and 9th sections of the act of 1839. But we think that the claim set up by defendant in error, that the twenty years limitations had run, can not be sustained for the reason that the lot was not in actual possession, which the law requires to make out a bar under that law, until 1874, and since that twenty years time has not elapsed. Charles Reed, the patentee of this lot in 1836, died in this State in 1863, and never was under any of the disabilities named in the act, and he had never conveyed the lot. The statute had begun to run one year before his death, and having commenced to run, would continue against any of his heirs, notwithstanding they might be minors.

We will next consider lots 4, 5, and 8 in block 99. The color of title to these lots is claimed as follows: First, to lot

Crowell v. Druley.

No 5, which is shown to be worth only about $50, we find a deed from S. O. Simmons and wife to August Grassman, dated September 17, 1857. This was tax title. Then as to the remaining two lots, the tax title of John Frederick and wife through mesne conveyances of Myron K. Branson to August Grassman, dated July 5, 1856. The objections to this color of title from Myron K. Branson to Micajah L. Adams and from said Adams to John Frederick on account of defect in description of lots and for other reasons, are not well taken, for the reasons that it is not necessary, in order to vest good color of title to the lots in Grassman by virtue of his deed from Frederick, that the title should be connected with any source of title whatever, so that it is not necessary to consider such objec ion. The objection to the certificate of acknowledgment to the deed to Grassman above named, from Frederick, is not pointed out specifically or the certifi-cate abstracted, and for this reason we must regard it as not well taken. The objections to the deed from Simmons to Grassman above mentioned, of the same nature, viz., that. Simmons never had a tax deed, and the lot had gone to sa'e after his tax purchase and was sold afterward, are not good as above decided. Then the color of title to lot 5 was in Grassman, September 17, 1877, and as to the other lots July 5, 1856. As has been shown said Grassman took actual possession of these lots in connection with lots 7 and 8, in block 98, in 1857 or 1858, and built a house on lot 7, and has had actual possession till he sold to Carpenter & Marsh, and the lots have so remained ever since, in actual pos-session in the various grantees of Grassman.

Taxes were paid on these lots by Grassman, and those claim-ing under him from 1871, which makes payment of taxes for more than seven years while Grassman and his grantees were in actual possession under color of title. Besides the Statute of Limitation of twenty years had run from 1857 or 1858 while the parties were in actual possession. Mark Beaubien entered lots 4 and 8 in said block, in 1836, never conveyed, and lived in the State until 1869, when he died. Martin H. Dem-mond entered lot 5 in 1835. He resided in the State till

1854, when he died, devising the lot to Sophia Demmond and Catharine M. Murray. Neither Beaubien, Demmond or his devisees were under any disabilities mentioned in the act of 1839, and the said devisees are still alive and under no disabilities nor were they at the time the title came to them. It seems as though the title to these lots was good without any reasonable doubt. The fact that the lots or some of them were sold for city taxes in 1873, could not defeat either of the above named bars.

As to lot No. 2 in block No. 107, the defendant in error claims that he has shown a clear title derived from the State of Illinois, this having been school land belonging to the State ceded from the government of the United States.

It is claimed by the plaintiff in error, the record of the deed from the patentee to Scammon, one of the links in the chain of title, should not have been admitted in evidence, claiming that the certificate of the acknowledgment of the deed does not show the official seal of the clerk of the Cambria County, Pennsylvania, Court, before whom the acknowledgment was taken. We find this claim to be an entire error in statement, as by reference to the record the seal appears. This alleged error having no foundation in fact, the court below committed no error in admitting it in evidence. The objection to the other deeds completing the chain of title to this lot are without foundation or merit, as well as to objections on account of taxes and deeds. Therefore, the title to this lot is good in defendant in error. This then completes the title to all the lots in question, and we think it good beyond any reasonable question or doubt, and so far as the complaint to the title is concerned it is not substantial. The title to the undivided half of the Johnson heirs in the lots was, as far as we can discover, procured in the manner contemplated by the agreement, and there appears to be no substantial defect in the proceedings. It is complained that the deed to the lot in question was not tendered in time by defendant in error, or the title to all the lots perfect in time, January 10, 1884. This objection is sufficiently answered by the fact that the time in which the deed was to be made was not of the essence

Crowell v. Druley.

of the contract; the time, however, in which the payments were to be made, was. The contract was unilateral in this respect. If the defendant in error had a good title at the time the decree was rendered it would be sufficient. The title to the feed mill on the property was not to be warranted, and only a quit claim deed was to be given by defendant in error to that portion of Shelby street in Joliet lying between Pleasant street and the Des Plaines river; and that part of Pleasant street, in said city, from the center of Jasper street to the west bank of the Des Plaines river was in the same condition. And the same was true as to lease on the extension of the railroad track when it was awarded, and no fraud appears in procuring the extension of the contract, or misrepresentation of defendant in error such as to forfeit the contract. The plaintiff in error knew well what he was buying, or could have known so by reasonable care.

In regard to the water power diverted from Des Plaines river to the oat meal mill property, we find the facts to be that before this contract had been entered into, the lease from the Illinois and Michigan canal to Druley, defendant in error, had been declared void by the courts (see Druley v. Adam, 102 Ill. 177), all of which plaintiff in error knew, and steam was put into the mill, he not relying on the water power. The taking of the new lease by defendant in error of the water power could work no injury to plaintiff in error, and he need not accept it unless he chooses, if he did not agree to the lease. But we think the evidence and circumstances pretty clearly show that he consented to the new lease, of which he now complains.

We see no objection that appears to us tenable urged by plaintiff in error against his carrying out the agreement on his part. We therefore think that the decree in this case should be affirmed.

Decree affirmed.