# THE SANITARY DISTRICT OF CHICAGO

*v.*

## WILLIAM J. ADAM *et al.*

*Opinion filed April 17, 1899.*

1. DEDICATION—*effect of vacation of street lying along river bank.* The vacation of a street, originally dedicated by the State and never transferred and lying between lots and a river, by a special act of the legislature, which provides that title to such street shall vest in adjoining lot owners, only passes title to such owners to the center of such street, and re-invests the State with title to that portion lying between the center and the middle thread of the river.

2. RIPARIAN RIGHTS—*ownership of west bank of DesPlaines river in school section addition to Joliet.* Title to that portion of the DesPlaines river lying west of the middle thread of the stream and east of what was formerly the center line of School street, and between lots 1 and 2 in block 57 and lots 1 and 4 in block 56 in school section addition to Joliet, is in the Commissioners of the Illinois and Michigan Canal, as representing the State of Illinois.

3. SAME—*effect of grant of privilege of constructing a dam.* A grant by the owner of land on one bank of a stream to the owner of land on the opposite bank, of a right to connect a dam across the stream with the land of the grantor, involves the right to occupy the grantor's land for the purpose of a dam as long as it is maintained.

4. SAME—*riparian proprietors may arrange for joint use of stream.* Riparian proprietors on opposite banks of a stream are joint owners of the stream and may make an arrangement for the joint use thereof, as neither can appropriate or use the stream in a manner which will injure the other.

5. CANALS—*construction of section 8 of Canal act.* Section 8 of the act concerning the Illinois and Michigan Canal, (Rev. Stat. 1874, p. 189,) which prohibits the commissioners from leasing canal lands for a period exceeding ten years, applies only to new leases made after the passage of the act, and does not control an agreement providing for the re-placement of a dam connected with canal lands on one side, which had existed with the consent of the canal commissioners for over forty years prior to such agreement.

6. EMINENT DOMAIN—*when verdict of a jury will stand on appeal.* Where there is a diversity of opinion and conflict of testimony as to the value of property condemned and the jury have made a personal inspection, the Supreme Court will not reverse on the ground that the damages are excessive or inadequate or that the evidence does not support the verdict.

7. The consent decree entered by the circuit court of Will county on September 17, 1883, in the case of *Canal Commissioners* v. *William Adam*, set out in full in the statement preceding the opinion in this case, was a valid decree, under which said Adam secured valuable rights, of which his heirs cannot be deprived by the present appellant without compensation.

APPEAL from the Circuit Court of Will county; the Hon. R. W. HILSCHER, Judge, presiding.

This is a proceeding, brought by the Sanitary District of Chicago, the appellant, against the appellees, William J. Adam, Robert M. Adam and Janette A. Royer, under the power of eminent domain to acquire title to certain property in the city of Joliet by virtue of the power vested in said sanitary district for the construction of its main channel.   The original petition was filed in the circuit court of Will county on July 8, 1897.  The property sought to be taken as therein described was lot 7 in block 25; block 38; lots 1, 2, 3 and 4 in block 45; lots 1, 2, 3, 4, 5, 6 and 7 in block 57; lots 1, 2, 3, 4, 5 and 6 in block 62, all in school section addition to Joliet.

Afterwards the petition was amended by dismissing as to lot 5 in block 62, and adding the following:  "All that part of Wallace street, which lies west of the west line of Water street, and that William J. Adam, Robert M. Adam and Janette Royer, Lizzie R. Adam as the wife of said William J. Adam, John C. F. Royer as the husband of Janette Royer, claim to have some interest in said property; that the title to said property is in the trustees of schools of township 35 north, range 10 east of the third principal meridian; also, that said William J. Adam, Robert M. Adam and Janette Royer claim to have an interest in the property described as all that portion of the DesPlaines river west of the center thread of the current of the DesPlaines river between what was formerly the center line of School street and such center line or thread of said DesPlaines river between lots 1

and 2 in block 57 and lots 1 and 4 in block 56 in school section addition to the city of Joliet in the city of Joliet, county of Will and State of Illinois; and that the title to said property is in the school trustees of township 35, etc., being that portion of the property hereinbefore described, which is occupied by the dam, pier, abutments, waste gates, masonry and fixtures pertaining to the same."

The circuit court heard proof of title and on September 13, 1897, entered an order, finding the title to the lots described in the original petition in William J. Adam, Robert M. Adam and Janette A. Royer, the appellees, and, as to the balance of the property described in the amendment, the court entered the following order: "As to all that part of Wallace street, which lies west of the west line of Water street northerly from the south between said west line of Water street and the DesPlaines river, the title is in William J. Adam, Robert M. Adam and Janette A. Royer; as to all that portion of the Des-Plaines river lying west of the center thread of the current of the DesPlaines river between what was formerly the center line of School street and the center line or thread of the DesPlaines river, between lots 1 and 2 in block 57 and lots 1 and 4 in block 56, school section addition to Joliet, the fee to said property is in the State of Illinois, but William J. Adam, Robert M. Adam and Janette A. Royer have an easement in said property in perpetuity by reason of a contract entered into between the canal commissioners of the Illinois and Michigan Canal, representing the State of Illinois, and one William Adam, and a decree of this court, general No. 10,926, by, through and under whom the said William J. Adam, Robert M. Adam and Janette A. Royer take title to such easement." The petitioner entered an exception to said order of September 13, 1897, as above quoted.

A trial was had, and the jury awarded to the appellees, as just compensation, the sum of $70,000.00 for all said land and property described in the original petition

and in said order of September 13, 1897, except lot 5 in block 62. Motion for new trial was made and overruled, and final judgment entered upon the verdict. The present appeal is prosecuted from the judgment so rendered.

The contract referred to in said order of September 13, 1897, is dated August 22, 1853, and was executed between Philo A. Haven and Orlando H. Haven, and the trustees of the Illinois and Michigan Canal; and is set out in full on pages 183, 184 and 185 in *Druley* v. *Adam*, 102 Ill. 177.

The decree referred to in said order, as having been entered in a case whose general number is 10,926, was so entered on September 17, 1883; and said case No. 10,926 is entitled "*The Canal Commissioners* v. *William Adam*." The decree so entered is as follows:

"And now come said complainants, the canal commissioners of the State of Illinois, by G. D. A. Parks, Olin & Phelps and E. F. Bull, their solicitors, and said defendant, William Adam, by Garnsey & Knox, his solicitors, and this cause coming on to be heard upon the pleadings herein by agreement of the parties hereto made and entered into in open court, it is ordered, adjudged and decreed as follows:

"*First*—The injunction heretofore entered herein is dissolved, all claim for or suggestion of damages for suing out the same are waived.

"*Second*—That said defendant, William Adam and his heirs and assigns, shall have the right to build, repair and maintain a dam across the DesPlaines river, from lot one (1) in block fifty-seven (57), in school section addition to the city of Joliet, on the east side of said river to the west bank of said river, on the site where his old dam now stands, such dam to be maintained clear across said river at a height of six (6) feet, measured from the surface of the water below said dam in a state of nature, without artificial obstructions in said river, to the surface of the water in the pool of said dam in an ordinary

stage of water, such dam to be so constructed, with good and sufficient waste gates, in the space of thirty feet in length at the western end of said dam between the abutment and pier, which shall be used by said defendant for the control of the water in the pool of his dam in case of unusual high water in said river, and by said complainant in the manner contemplated by the Haven release hereinafter referred to.

"*Third*—If so much water shall be found in said river, over and above that needed for the purposes of navigation, said canal commissioners shall be required to permit to flow over the dam across said DesPlaines river on Jefferson street, in the city of Joliet, in said county, known as dam No. 2, a quantity of water equal to eighteen thousand cubic feet per minute, which shall be first-class water power on said dam No. 2.

"*Fourth*—Said canal commissioners and their successors shall be permitted forever to divert and draw from the water of said river, on the Channahon level of the Illinois and Michigan Canal, and to lease, use and discharge the same below the dam of the said defendant for water power purposes, a quantity of water equal to twelve thousand cubic feet per minute, (if so much water shall be found in said river over and above water needed for navigation and over and above the said eighteen thousand cubic feet per minute on dam No. 2.) And said commissioners and their successors shall have the right to enjoy the rents, issues and profits thereof, and said Adam, his heirs and assigns, shall be and are forever barred from bringing any action against said commissioners and their lessees therefor. Such water power on said Channahon level to be second-class to the water power on said dam No. 2.

"*Fifth*—If said commissioners or their successors shall deem it expedient so to do, they shall have the right to divert and draw from said river, through said Channahon level, below the dam of said defendant, from any surplus

remaining over and above the water hereinbefore provided for, such quantity of water for hydraulic purposes as they see fit and proper, such water power to be third-class to that on dam No. 2, and such third-class water power shall be divided equally between the canal commissioners or their successors and the said Adam. Said Adam, his heirs and assigns, shall have the first right to lease the half of such third-class water power belonging to said commissioners upon the same terms and at the same rates charged to other lessees of the State on the Channahon level; that in the event of any such lease to said defendant, the place where the water is used shall be located at a point where said defendant can use the same, and where such use will not, in the opinion of the canal commissioners or their successors, interfere with the navigation or protection of said canal, and that in case such lease be made, reasonable access shall be given said defendant to such point over the land controlled by said complainants or their successors, and the same right to put in and to maintain on the premises of said complainants suitable structures to properly the utilize said power, and such other privileges as are given to other lessees of complainants on said level.

"*Sixth*—The wing dam below defendant's dam shall not be maintained to the injury of said complainants or their successors.

"*Seventh*—The rights and obligations of the complainants and defendant under the Havens release, found in the case of *Druley* v. *Adam*, in Vol. 102 of Illinois Reports, on pages 183, 184 and 185, except so far as modified by this decree, shall remain in full force.

"*Eighth*—That said Adam may maintain the dykes or embankments on the east side of said river at the place where the same now stand and as the same now exist.

"*Ninth*—The court reserves the right to make such further order as shall be necessary to carry any provision of this decree into effect.

"*Tenth*—The complainants and defendant shall respectively pay their own costs."

School section 16, in which the property in controversy is located, was subdivided and platted in 1834. The plat shows that the DesPlaines river runs through the section in a northerly and southerly direction.  Lots 3 and 4 of block 45, and lots 1, 2, 3, 6 and 7 in block 57 lie upon the east side of the river.  In 1878 the city of Joliet, by ordinance duly passed, vacated Wallace street lying between the west line of Water street and the east bank of the river.  The part so vacated lies between lot 4 in block 45 and lot 1 in block 57.  Lots 1, 4, 5 and 8 of block 56 and lots 4 and 5 of block 57 lie west of the river.  School street runs north and south on the west side of the river, and between a part of block 56 and lots 4 and 5 in block 57. The west line of School street as platted is along the east line of block 56.  Lots 1 and 2 in block 57 being upon the east bank of the river are directly opposite lots 1 and 4 in block 56, which lie west of School street on the west bank of the river.  As platted, School street is sixty-six feet wide where it has defined parallel lines.

In 1839 or 1840 Philo A. and Orlando H. Haven were the owners of lots 1 and 2 in block 57, and had some kind of title through a tax deed to lots 1 and 4 in block 56, and about that time constructed a dam across the river from lot 1 in block 57 to a point on the west bank of the river on a line with the dividing line between lots 1 and 4 in block 56.  Lots 4 and 5 of block 57 lie on the west side of the river below the west end of the dam; and between the north end of lot 4 in block 57 and a point considerably north of the dam there is no east line of School street shown on the plat parallel with the west line.  In other words, the east line of School street for a considerable distance north of lot 4 in block 57 and at the west end of the dam is nothing more than the west bank of the river, as shown by an irregular wavy line on the plat.  Lots 1, 2 and 3 in block 57 were sold and patents therefor were

issued in 1835, and lots 1 and 4 in block 56 were sold and conveyed by patent in 1834.

Under the act of 1836 relative to the canal, work was commenced in 1836 or 1837 on the Illinois and Michigan Canal, which appropriated all or nearly all of lots 1 and 4 in block 56 and a considerable portion of School street lying east of those lots, which it has continued to use ever since.

The testimony shows, that the west abutment of the dam rests against the tow-path of the Illinois and Michigan Canal and stands seven feet east of the center of School street. The canal and tow-path occupy the west thirty-three feet of School street. The dam has been maintained in its present location from the time when the tow-path bank was built and the abutment of the dam was built against it. When the canal was constructed at this point, the west end of the dam was cut off, and the tow-path bank of the canal built ten feet in the bed of the river. At the west end of the dam is a waste gate, lying between the abutment above mentioned and a pier built in the river. William Adam acquired the patent title to lots 1, 2 and 3 in block 57 by *mesne* conveyances from the Havens. The present appellees are the children of William Adam, and take his title by will. The title to lots 1 and 4 in block 56 appears to have passed from the Havens to certain parties named Truby, strangers to this record. No conveyance has ever been made to the ground lying partly under the DesPlaines river between the center thread of the river opposite lots 1 and 2 in block 57 and the center of School street opposite lots 1 and 4 in block 56, nor has it ever been assessed for taxes.

Upon the trial below there was introduced in evidence a joint resolution, passed by the legislature of Illinois at its session beginning on January 3, 1883, and ending January 18, 1883, (Laws of 1883, p. 184), which joint resolution is in the words and figures following, to-wit:

## "WATER POWER AT JOLIET.

"WHEREAS, from the relative location of the Illinois and Michigan Canal and the DesPlaines river, in the city of Joliet, Will county, the State of Illinois became and is the proprietor and possessor of the west bank of said river, opposite lots one (1), two (2) and three (3), block fifty-seven (57), school section addition to Joliet, situated on the east bank thereof; and whereas, the owners of said lots, being riparian owners on the east bank only, as determined by the Supreme Court in the case of *Canal Trustees* v. *Haven,* 11 Ill. 554, have converted their said property into a mill site, and constructed and maintained, and do now maintain, à mill-dam across the entire bed of said river, extending west from or near the north-west corner of said lot one (1) above mentioned, thereby creating a water power of great value; and whereas, the State of Illinois, in respect to its rights as riparian owner upon the west bank of said river, is legally entitled to use and appropriate one-half the water power thus created, and is enabled at the present time to utilize the same as an important and permanent source of revenue, by means of structures of simple form, small extent and inconsiderable expense, and, with proper joint arrangements with the owner or owners of the other half usual in such cases; therefore, be it

"*Resolved by the Senate, the House of Representatives concurring herein:* (1) That the canal commissioners be and they are hereby directed and empowered to assume possession and control of said water power so belonging to the State of Illinois, and forthwith to take such measures as they shall deem proper and expedient to secure for the use of the practical enjoyment and benefit thereof, and to this end to cause to be erected all needful structures upon said west bank for developing and transferring said power, and thereupon to lease the same as they are now authorized by law to lease the water power of the Illinois and Michigan Canal; (2) that the cost of

such structures and all expenses of said work, or incident thereto, shall be defrayed from the canal revenues, and shall in no event become a charge against the State; (3) that said commissioners shall be and hereby are empowered, in their discretion, to make with the riparian proprietor or proprietors on the east or opposite bank, just and proper arrangements for the joint regulation of said water power and for the equitable division thereof, and for the future maintenance and repair or reconstruction of said dam: *Provided, however*, that in prosecuting the objects contemplated by this joint resolution and in entering into needful stipulations with the riparian owner or owners on the east bank of the DesPlaines river, the said canal commissioners shall in nowise surrender, compromise or impair any legal rights of the State in and to the use of the water upon the Channahon level of the canal, for hydraulic purposes, below said dam, commonly called 'Adam's dam,' if any such legal right shall hereafter be established by judicial proceedings thereto had."

HALEY & O'DONNELL, and H. M. SNAPP, (F. W. C. HAYES, of counsel,) for appellant.

GARNSEY & KNOX, J. J. PARKER, J. C. F. ROYER, and DONAHOE & McNAUGHTON, for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The main objection pressed upon our attention by counsel for appellant, is that the consent decree, entered on September 17, 1883, by the circuit court of Will county in the case then pending of *Canal Commissioners* v. *William Adam* was entered without authority of law and without jurisdiction of the necessary parties, and is therefore void. The order, entered by the trial court on September 13, 1897, is claimed to be erroneous, because it is based upon said consent decree. We do not understand counsel for appellant to claim, that said order is erroneous, so far

as it is based upon the contract of August 22, 1853, entered into between the canal commissioners of the Illinois and Michigan Canal, representing the State of Illinois, and William Adam.   The objection made to the order is made manifest in the record by the exception taken to the order at the time of its entry, and also by exceptions to certain instructions given by the court to the jury, which recognize the validity of the consent decree.   The order objected to finds, that the portion of the DesPlaines river, which lies west of the center thread of the current of that river between what was formerly the center line of School street and the center line or thread of the Des-Plaines river between lots 1 and 2 in block 57 and lots 1 and 4 in block 56, school section addition to Joliet, is owned in fee by the State of Illinois.   Counsel for appellant admit, however, in their brief that the fee to the west half of the river is in the State of Illinois, but claim that it is held by the State for school purposes, and is in fact school land.   The argument is, that the consent decree, by granting to William Adam and his heirs and assigns the right to build, repair and maintain a dam across the DesPlaines river from lot 1 in block 57 in said school section addition on the east side of said river to the west bank of said river, thereby in effect made a sale or lease of school land, without complying with the provisions of the School law in force in 1872 as to the mode of making sale or leases of school lands.

It being conceded that the title to that portion of the river, which lies between the center thread of the river and the center line of School street, is in the State of Illinois, it can be a matter of no concern to appellant, whether the State of Illinois holds the land as school land, or as canal land.   If the school trustees had any interest in the land or the proceeds derived from its disposition, and if the commissioners of the Illinois and Michigan Canal have improperly disposed of such land, a controversy might arise between the school trustees

and the canal commissioners.   The appellant can have no interest in such controversy if it arises.

We are of the opinion, however, that, under the circumstances developed by this record which require a decision of the question, the west half of the DesPlaines river at the point in question, that is to say, the land lying between the center thread of the river and what was the center of School street, must be regarded as belonging to the commissioners of the Illinois and Michigan Canal, representing the State of Illinois.   In other words, it is canal land and not school land.

It is true, that section 16, of which the property in question is a part, was originally school land, and was subdivided and platted as such in 1834.   It appears, however, that shortly thereafter the lots in blocks 57, 56, 45 and other blocks were sold, and patents were issued therefor to the purchasers.   From these purchasers Philo A. and Orlando H. Haven derived their title to lots 1, 2, 3, 4 and 5 in block 57, and William Adam, under whom the appellees hold as devisees by will, derived title from the Havens.   School street was designated as a street upon a plat of said school section.   The title to the land embraced within School street, if the plat was properly made out, certified, acknowledged and recorded, would have vested in the town of Joliet, if that town had had at that time a corporate existence.   If the town did not at that time have a corporate existence, the fee to the street remained in abeyance, subject to vest in the corporation when it should be created.   It appears from the evidence, that at that time the town of Joliet had no existence, but, subsequently on March 1, 1837, the legislature passed an act incorporating the town of Joliet and defining its boundaries. (Private Laws of Ill. of 1836, p. 194).   Whether the fee to the street absolutely vested in the town of Joliet, when thus incorporated in 1837, would depend upon the question whether the dedication of the street was accepted by the corporation or not.   (*Canal*

*Trustees* v. *Haven*, 11 Ill. 554; *Hamilton* v. *Chicago, Burlington and Quincy Railroad Co.* 124 id. 235). If the plat was not properly made out, certified, acknowledged and recorded, and if there was no acceptance by the town of the dedication of the street, then the dedication was a mere common law dedication; and the title to the street vested in the adjoining owners, subject to the easement of the public, the title of the adjoining owners extending to the center of the street. (*Matthiessen & Hegeler Zinc Co.* v. *City of LaSalle*, 117 Ill. 411; *Village of Vermont* v. *Miller*, 161 id. 210; *Jordan* v. *City of Chenoa*, 166 id. 530).

By act of the legislature approved January 27, 1841, (Laws of 1841, p. 317), the act of March 1, 1837, incorporating the town of Joliet and defining its boundaries, was repealed. In addition to this, by an act approved on February 17, 1851, it was enacted by the legislature, that so much of Allen street and DesPlaines street as passed over or lay upon a certain mound occupying the adjoining corners of certain blocks in school section addition to the town of Joliet, from the foot of said mound, on each side, "together with so much of School street as lies between blocks 56 and 57 in said school section addition to Joliet, be and the same are hereby vacated; and shall belong to and the title of them is hereby vested in the owners of the adjoining lots." (Priv. Laws of 1851, p. 274).

No lots were laid out upon the east side of School street upon that part of said street, which lay between lots 1 and 4 of block 56 and the west bank of the Des-Plaines river opposite lots 1 and 2 in block 57. The only lots in block 57, which lay upon the west side of the river and east of School street, were lots 4 and 5 opposite lots 5 and 8 in block 56. As the act of February 17, 1851, only vacated so much of School street as lay between blocks 56 and 57, the part of that street, which the legislature intended to vacate, must have been the part lying between block 56 and lots 4 and 5 in block 57. There was no part of School street, which lay between

lots 1 and 4 in block 56 and lots 1 and 2 in block 57, because the latter lots were on the east side of the river, and the street was between the former and the river. Although north of lot 4 in block 57, and at the point where the Adam dam was united to the west bank of the river, there were no lots abutting upon the east side of School street upon the west side of the river, the east side of School street at that point being the west bank of the river, yet counsel for appellees contend, that the· space between the center of School street, which is claimed to have extended eastward to the middle of the river, and the middle of the river was a part of the street, and, as the ownership of lots 1 and 2 in block 57 on the east bank of the river extended to the middle thread of the river, it is, therefore, argued that said lots 1 and 2 abutted upon the east side of the street. This argument is more fanciful than real. It is true that under the doctrine laid down in *Village of Brooklyn* v. *Smith,* 104 Ill. 429, the street extended to the center of the river. But we apprehend that the expression "adjoining lot owners," as used in the act of 1851, applies to the owners of lots abutting upon a street through which access can be had to their lots, and does not refer to lots on opposite sides of a river, the ownership whereof may extend to the center thread of the river.

When in 1841 the charter of the town of Joliet was repealed, the title to the west half of School street vested, either in the original owners of the lots abutting thereon, or in the owners of such lots at the time the repeal act was passed. Whether the title vested in the original owners, or in the then existing owners, would depend upon the question whether the plat had been properly acknowledged and recorded, and the dedication of the street had been accepted. As to the east side of the street, however, that is to say, the portion of the street lying between the center line thereof and the center thread of the river, the title thereto, upon the repeal of the char-

ter, reverted to the State of Illinois, the original dedicator; and it makes no difference whether the dedication was a statutory or a common law dedication. In such cases, upon the repeal of the municipal charter, the property held by the municipality for public uses passes under the immediate control of the State. (1 Dillon on Mun. Corp.—4th ed.—sec. 169 *a*). It is conceded, that there had been no sale or transfer of the ground lying east of the center of the street and between such center and the center thread of the river between lots 1 and 4 in block 56 and lots 1 and 2 in block 57. It must be remembered, that the dam which was constructed extended from lot 1 in block 57 across the river to a point on the west side thereof opposite the dividing line between lots 1 and 4 in block 56.

Even if the act of 1851, vacating that portion of School street lying between blocks 56 and 57, had the effect of vacating the street at the point where the abutments and pier of the dam were constructed, in that event the title to the land at that point between the center of the street and the center of the river vested in the State of Illinois, as the State was the original dedicator and no transfer had ever been made. Therefore, the contention of the appellees that they owned the whole bed of the river extending from the east to the west bank thereof between lots 1 and 4 in block 56 and lots 1 and 2 in block 57 can not be maintained. In *Canal Trustees* v. *Haven*, 11 Ill. 554, which was a suit brought by the Havens, the grantors of the present appellees, against the trustees of this very canal to recover damages for diverting the water of the DesPlaines river from the mill of the Havens, it was expressly decided that the Havens were not riparian proprietors on the west bank of the river. This court in its opinion in that case says: "They (the Havens) were the owners of lots 1 and 4 in block 56 on the west side of the river, from which, however, they were separated by a street (School street) running up and down the stream.

These lots lie directly opposite those owned by them on the east side of the river (lots 1 and 2, etc. in block 57). Nearly all of the lots, and the whole of the street, are now occupied by the canal. * * * Independent of the statute, there is a decisive objection to the claim of the appellees (Havens) to riparian rights on the west bank of the river. By the common law, a grant of land bordering on a highway or river, carried the exclusive right and title in the highway or river to the center thereof, subject to the right of passage in the public, unless the terms of the grant clearly indicated an intention on the part of the grantor to confine the grantee to the edge or margin. In such case, the highway or river is regarded as the boundary or monument, and the purchaser takes to the middle of the monument, as part and parcel of the grant. This is stating the principle as broadly as it is laid down in any of the elementary books, or established by any of the adjudged cases. Conceding, then, for the purpose of the argument, that the doctrine of the common law is strictly applicable to this case, and applying it in its full extent, the appellees (Havens) would fail utterly to make good their claim. Their grant would only carry them to the middle of the boundary. They would have no title whatever to the east half of the street, or the west half of the bed of the river. In every point of view, therefore, the appellees (Havens) are not riparian owners on the west bank of the stream. * * * Instead of owning the entire bed of the river, and having an exclusive right to the use of the whole of the water, they are the proprietors of only half of the bed of the stream."

Whether or not, upon the repeal of the charter of the town of Joliet in 1841, and later by the vacation of the portion of School street above mentioned in 1851, the title, which became re-vested in the State, was a title to school lands or to canal lands is a question of no little difficulty. Certainly it is true, that, when the State platted section 16 into lots and blocks and sold out the

lots, it disposed of the lots as school land; after the re-
vesting of the title, the State used the lots for the pur-
poses of the Illinois and Michigan Canal. This it was
authorized to do under existing statutes. The act of Jan-
uary 9, 1836, for the construction of the Illinois and Michi-
gan Canal provided in sections 20 and 21, that the canal
commissioners should have "full power and authority in
their good judgment to do in relation to the construction
and completion of the said canal all things not otherwise
herein provided for," and that it should be "lawful for
them to enter upon and use any lands, water, streams and
materials of any description necessary for the prosecu-
tion of the works contemplated by this act." (Laws of
Ill. of 1836, p. 148). The act of February 21, 1843, in re-
lation to the completion of the canal provided, that the
trustees of the canal, as therein created, should possess
all the powers conferred upon the canal commissioners
by the act of 1836; and section 10 of the act of 1843
granted irrevocably to the trustees of the canal the bed
thereof "and the land over which the same passes, includ-
ing its banks, margins, tow-paths, feeders, basins, right
of way, locks, dams, water power, structures, stone ex-
cavated and stone and materials quarried, purchased,
procured or collected for its construction; and all the
property, right, title and interest of the State, of, in, and
to the said canal, with all the hereditaments and appur-
tenances thereunto belonging." (Laws of Ill. of 1842-43,
p. 56). In the construction of the canal the canal trustees
took possession of School street between lots 1 and 4 in
block 56 and lots 1 and 2 in block 57, or the greater part
thereof, and built the canal in the street itself. In *Canal
Trustees* v. *Haven,* 5 Gilm. 548, which was a suit by the
Havens, the grantors of William Adam, against the canal
trustees to recover damages for injury to their mill and
a diversion of the water of the DesPlaines river from said
mill, being the same suit which was again brought before
this court and subsequently reported as *Canal Trustees* v.

*Haven*, 11 Ill. 554, this court said: "Map 2 shows that the whole of lot 4, and nearly all of lot 1 in block 56, as well as the street between said lots and the river, and several feet of the river, are embraced by the canal itself; so that one side of the river, including a portion of the dam of the appellees, is now occupied by the canal, and upon the opposite side lie lots 1 and 2 in block 57." In the opinion in the case of *Canal Trustees* v. *Haven*, 5 Gilm. 548, this court, in giving a history of the facts about the building of the canal and of the dam owned by the Havens, said: "Soon thereafter, the commissioners of the Illinois and Michigan Canal, in constructing said canal, removed the west end of said dam, so that it became connected with the east bank of the canal, which bank encroached upon the natural channel of the river about ten feet." The testimony introduced in the case at bar shows that the west abutment of the dam rests against the tow-path of the canal and is east of the center of School street. So that a portion of the canal, or of the tow-path sixteen feet wide on the east side of the canal, occupies a portion of School street east of the center line of said street. Not only did the canal trustees or commissioners take possession of the east half of School street extending to the center thread of the river in the manner already stated, but, in the decisions made by this court, the canal trustees or commissioners have always been recognized as the riparian owners of the west bank of the river at this point. In *Canal Trustees* v. *Haven*, 5 Gilm. 548, this court, while holding that the Havens had a right to the east half of the stream and to use the water embraced within the east half for the purpose of running the machinery of their mills located on lots 1 and 2 in block 57, at the same time held that the appellants in that suit, the canal trustees, were entitled to the other side of the river, that is, the west half. In *Druley* v. *Adam*, 102 Ill. 177, which was an action brought by Adam, the ancestor of the present appellees, against Druley, as lessee of the

canal commissioners, to recover damages for diverting water of the DesPlaines river from this same mill, it was distinctly stated, that the canal commissioners, successors in trust to the canal trustees, acquired their rights in operating the canal at Joliet because of the riparian rights of the State at that place, and because of the agreement of August 22, 1853, with the Havens.

The appellees are estopped from insisting that the State of Illinois is not the owner of the west half of the river here in controversy. The court below found, that the State of Illinois owned the fee to the west half of the river, but found at the same time that the appellees had a perpetual easement therein. The appellees have assigned no cross-errors, and cannot object to the decree which is substantially in their favor. Moreover, they claim their rights in this case under a joint resolution of the legislature, which expressly states that "the State of Illinois became and is the proprietor and possessor of the west bank of said river opposite lots 1, 2 and 3, block 57, school section addition to Joliet, situated on the east bank thereof." They also claim their rights under the consent decree of September 17, 1883, which recognizes the State as the riparian proprietor of the west bank of the river at the point where their dam is there constructed. By the consent decree, William Adam and his heirs and assigns, were granted the right to build a dam across the river from the east to the west side thereof, and such grant by the canal commissioners would be useless and of no value, unless they, as representing the State, held the title to the west half of the river.

Our conclusion upon this branch of the case is that the title to the west half of the river, that is to say, to the ground lying west of the center thread of the river and between such center thread and the center of School street on the west bank of the river, between lots 1 and 2 in block 57 on the east side of the river and lots 1 and 4 in block 56 on the west side of the river is in the commis-

sioners of the Illinois and Michigan Canal, as representing the State of Illinois. In this respect the decree is correct.

The next question which arises relates to the validity of the consent decree, entered on September 17, 1883. This decree amounts to nothing more than an agreement between the canal commissioners, complainants, and William Adam, defendant, the parties to the suit in which it was entered. The main ground, upon which the appellant contends that this consent decree was void, is that it confers upon William Adam, the devisor of the appellees herein, rights which the canal commissioners had no power to grant. The court below considered the decree as granting to the appellees a perpetual easement in the west half of the river between lots 1 and 2 in block 57 on the east side thereof and the center of School street opposite lots 1 and 4 in block 56 on the west side thereof. Whether the designation of the interest granted as a perpetual easement is technically correct or not, such interest amounted in its character and extent to what was really and in fact a perpetual easement. The canal commissioners, being the owners of the land between the center of School street and the center thread of the river, including the land under the west half of the river, granted by the terms of the decree to William Adam the right to build, restore and maintain upon the west bank of the river, belonging to the canal commissioners, the western end of his dam at the site where it had theretofore stood. He was to construct the dam with good and sufficient waste gates in a space thirty feet in length at the western end of the dam between the abutment and the pier. The grant was to William Adam and his heirs and assigns. Where the owner of land on one side of a stream grants to the owner of land on the opposite side a right to connect a dam across the river with the land of the grantor, such grant involves the right to use and occupy the grantor's land for the purpose of a dam so long as the dam is kept up. It has been said, that such

an interest is not a mere easement, but is to be deemed a freehold, determinable upon the cessation of the mills built upon the opposite side of the stream, or as a demise for the time the mills shall continue to run. (Angell on Water-courses,—7th ed.—sec. 91; *Dryden* v. *Jepherson*, 18 Pick. 385). We do not, however, understand counsel for the appellant to contend that the consent decree did not grant a right, as extensive in its nature as that which is involved in a perpetual easement. On the contrary, it is assumed or taken for granted that the court below correctly construed said decree as conferring a perpetual easement or an interest equivalent thereto, and the decree is attacked solely upon the ground of a want of power in the commissioners to grant such an interest.

The main objection, urged against the want of power to grant the interest, is based upon the fact, that section 8 of the act in relation to the Illinois and Michigan Canal, etc., being chapter 19 of the Revised Statutes, confers upon the canal commissioners the power to lease from time to time any of the canal lands or lands owned by the State, "provided no lease shall be for a period exceeding ten years." The claim here is, that the commissioners had no power to grant an interest by way of lease in the premises in question for a longer period than ten years, whereas they granted an interest in perpetuity, or made a demise for the time the mill on the opposite bank of the river should run or be kept up. Upon a careful consideration of all the facts shown by the evidence in the record in this case, we have come to the conclusion that the provision of section 8 of the Canal act as above referred to does not apply to the consent decree here under consideration. That provision applied only to new leases to be granted in the future after the passage of the act of 1874.

It must be remembered, that the Havens had constructed their mills on block 57 on the east bank of the river, and had connected their dam across the river with

the west bank thereof, as early as 1839 or 1840, and be-
fore the Illinois and Michigan Canal was completed, and
before it was constructed at that point.    The canal com-
missioners, when they constructed the canal at the point
in question, found the dam connected with the west bank,
and removed the west end of the dam, so that it became
connected with the east bank of the canal.    (*Canal Trus-
tees* v. *Haven*, 5 Gilm. 548).    No effort was made at this
time by the canal trustees or commissioners to interfere
with the connection of the dam with the west bank of
the river, except to shorten its western terminus.    They,
however, permitted the west end of the dam to remain
connected with the east bank of the canal.

Subsequently litigation arose between the canal trus-
tees and the Havens, growing out of the diversion of
water from the DesPlaines river into the canal and con-
sequent injury thereby to the running power of the mills
of the Havens on the east bank of the river.    This liti-
gation and the nature of it may be seen by reference to
the cases already referred to of *Canal Trustees* v. *Haven*,
5 Gilm. 548, and *Canal Trustees* v. *Haven*, 11 Ill. 554.    In the
latter case, it was said by the court that the erection
of the dam across the stream was unauthorized.    Sub-
sequently, however, on August 22, 1853, the litigation
between the parties was settled by the execution of the
release or contract heretofore referred to, dated August
22, 1853.    That agreement or release recites upon its face,
that the parties are mutually desirous of avoiding further
litigation.    By its terms the right of the canal trustees
to divert the water from the river into the canal was con-
fined to the supplying of the canal with so much water,
as would be necessary for the purposes of navigation.
When, afterwards, by reason of structures erected north
of the Adam dam, the volume of the water was increased,
so as to exceed what was necessary for navigation, a fur-
ther litigation arose between William Adam, the devisor
of the appellees, and one Druley holding under a lease

from the canal commissioners. The nature of this litigation will be seen by reference to the case of *Druley* v. *Adam*, 102 Ill. 177. In that case it was held, that the use of the water by the canal trustees in excess of that needed for navigation, creating a motive power for the benefit of others, was a use not within the language or spirit of the agreement; and that the lease made to Druley was void. In *Druley* v. *Adam, supra,* this court recognized and established the validity and binding force of the agreement of August 22, 1853, between the canal trustees and the Havens, grantors of William Adam. By the terms of that contract or release it was further agreed, that the superintendent, or any person having charge, of the canal might reduce the water above the mill-dam of the Havens for the purpose of repairing the canal; and that such reduction of the water might be accomplished by opening the waste ways at the west end of said mill-dam. It was, however, provided that the waste ways at the west end of the mill-dam should be closed by the superintendent of the canal as soon as such repairs could be completed; and that such waste ways should not be open except for such repairs, nor remain open more than for the period of one week at any one time without compensation to the Havens. It thus appears, that the agreement of August 22, 1853, recognized the right of the Havens to have and maintain the waste ways at the west end of their mill-dam, which was located upon the property in question. By agreeing that such waste ways should not be allowed to be open longer than a week at any one time without compensation to the Havens, the canal commissioners virtually admitted the right of the Havens to maintain such waste ways and mill-dam upon the west bank of the river and over the west half of the river. As this court in *Druley* v. *Adam, supra,* sustained the validity of the contract of 1853, it seems necessarily to follow that the contract embodied in the consent decree of September 17, 1883, must be regarded as valid.

The Havens and William Adam, their grantee, who was the devisor of these appellees, maintained the dam across the river in practically the same manner as it was left after the completion of the canal, and used the water power developed thereby in the operation of mills of different descriptions on the east side of the river on blocks 45 and 57, and other blocks, until the year 1883. They were thus permitted by the canal trustees or commissioners to maintain the dam across the river for a period of thirty years after the execution of the release of August 22, 1853. In 1883 the waste gates at the west end of the dam were carried out by a flood, which occurred during that year. Just prior to the occurrence of this flood, and in 1882, William Adam had begun three actions on the case in the Will county circuit court against different parties to recover damages for drawing water from the river above Adam's dam through the Channahon level of the canal to an amount in excess of that permitted by the Haven agreement. A little later, Adam also filed separate bills in the same court against the same parties to prevent the use by them of water in excess of the quantity fixed in said contract or release.

While the suits last above mentioned were pending, William Adam, on May 22, 1883, filed a bill in the same court against the superintendent of the canal, setting up his ownership of the blocks on the east side of the canal and his title thereto, and reciting the litigation reported in 5 Gilm. and 11 Ill., and the execution of the Haven agreement on August 22, 1853. The bill further recited the carrying away on May 12, 1883, of the sluice gates at the west end of the dam by the high water, thereby permitting the water to flow around the dam away from the mills of complainant. The bill also alleged a right under the Haven agreement to attach the dam to the canal bank. On the next day, May 23, 1883, the canal commissioners filed a bill against William Adam in the same court, case No. 10,926. This latter bill recited the

ownership by Adam of the lots on the east bank of the river, and that he was entitled to use the river only to the center of the stream; that the State of Illinois was riparian proprietor on the west bank of the river and entitled to half of the water flowing therein; that Adam was proceeding to complete a dam across the river and attach it to the canal bank without right, and alleging that the State owned valuable water power rights which would be damaged by the construction of the dam. An injunction was therein issued, restraining Adam from re-constructing the dam. In addition to the suits above mentioned, an information was filed on April 6, 1883, on behalf of the People of the State by the Attorney General of the State against William Adam and others.

About the time of the entry of the consent decree all the suits above mentioned, including the information filed in behalf of the People, were settled. All of the suits, except that in which the consent decree was entered, were dismissed by agreement. The consent decree in the chancery suit of the canal commissioners against William Adam, although entered in that particular suit, was intended to be a settlement of the whole litigation involved in all the suits.

Before the settlement last above mentioned was made, and in January, 1883, a joint resolution was passed by the legislature, which is set forth in the statement preceding this opinion. By the terms of this joint resolution the canal commissioners were "empowered in their discretion to make with the riparian proprietor or proprietors on the east or opposite bank just and proper arrangements for the joint regulation of said water power, and for the equitable division thereof, and for the future maintenance and repair or reconstruction of said dam." This resolution recognized the existence of the mill-dam constructed theretofore by Adam across the river, and not only so, but provided for its repair or reconstruction.

It is claimed by the appellant, that the joint resolution thus referred to was invalid, and conferred no such powers upon the canal commissioners as are therein set forth.  It is undoubtedly true, and has been so held by this court, that such a joint resolution does not have the force of law.  (*Burritt* v. *Comrs. of State Contracts*, 120 Ill. 322).  In the latter case, it was held that such a joint resolution is wanting in the essentials requisite to a valid enactment, and is not a law of the State, and has not the force and effect of law.  The joint resolution in the *Burritt case* provided for diverting to other uses appropriations, which had been made for specific purposes.  The joint resolution in the present case is not of such a character, but expressly provides that all expenses provided for therein shall be defrayed from the canal revenues, and shall in no event become a charge against the State. In other respects, however, than in relation to the appropriation of public money the joint resolution here cannot be regarded as other or different from that considered in the *Burritt case*.  While, however, it cannot be regarded as having the force and effect of law, it is yet an expression of the legislative will upon the subject matter involved in it.  It was a proper mode of expressing the legislative will concerning a mere temporary matter, and in respect to the duties of certain merely ministerial officers.  (Cushing's Law of Legislative Assemblies, sec. 2403).

Independently, however, of the validity or constitutionality, as a law, of the joint resolution, the canal commissioners had the power to make the agreement embodied in the consent decree.  That decree did not provide for connecting a new dam with the west bank of the river, nor for the construction of a new pier, or a new abutment, or of new waste ways.  It merely provided for the reconstruction and replacement of the dam connected with the west side of the river, which had been accidentally washed away by a flood, and which had theretofore existed for more than forty years, and which had there-

tofore been permitted to exist during such period of time by the canal trustees or commissioners. At that time, also, this court had rendered its decision in *Druley* v. *Adam, supra,* and had substantially recognized the right of Adam to maintain the dam upon the west bank of the river. The *Druley case* had held that, under the contract of 1853, the canal commissioners were only entitled to divert so much of the water of the DesPlaines river into the canal, as was necessary for purposes of navigation. By the terms of the consent decree, the canal commissioners secured the right to divert and draw from the river a greater amount of water than was necessary for the purposes of navigation. They thereby also secured the right to lease, use and discharge such surplus water below the dam of Adam for water power purposes. In other words, they secured by agreement with Adam the right to make leases of the same character as the lease, which had been executed to Druley, and which was held to be void in the *Druley case* by reason of its being in violation of the contract of 1853.

The agreement, embodied in the consent decree of 1883, was an agreement between the canal commissioners, as riparian proprietors of the west bank of the river, and Adam, as riparian proprietor of certain lots on the east bank of the river. Neither the canal commissioners, nor William Adam, at that time owned the entire bed of the river, or had an exclusive right to the use of the whole of the water in the river. The canal commissioners were proprietors of only half of the bed of the stream, and entitled to use but half of the water naturally flowing along the channel. Adam also was the proprietor of the other half of the bed of the stream, and entitled to use half of the water naturally flowing along the channel. In *Canal Trustees* v. *Haven*, 11 Ill. 554, we said: "The property in a stream of water is regarded as indivisible. Each riparian proprietor is bound to use it as an entire stream in its natural channel; for a severance would destroy the rights

of all.  One proprietor cannot so appropriate or use the stream as materially to injure others jointly interested in it."  The same doctrine was announced and endorsed in *Druley* v. *Adam, supra.*  It necessarily results from this joint ownership of the water in the stream, that the proprietors of the property on both sides of the stream have the right to make some arrangement with each other for the joint use of the water in the stream.  The power to make such arrangement is necessarily involved in the joint ownership of the water.  In Angell on Water-courses, (sec. 100) it is said: "Wherever a water-course divides two estates, the riparian owner of neither can lawfully carry off any part of the water without the consent of the other opposite."  The plain inference is, that the carrying off of a part of the water can be effected by one riparian owner with the consent of the other.  (Ibid. sec. 108).  In *Plumleigh* v. *Dawson*, 1 Gilm. 544, we said (p. 551): "The property in the water is indivisible.  The opposite or other proprietors in common, must use it as an entire stream, or whole, in its natural channel or body, for there can be no severance into parts in its use for hydraulic purposes, at least without consent."  Here, the canal commissioners, in consideration of permitting Adam to reconstruct his dam which had been swept away by a flood, secured from him valuable privileges in relation to the diversion of water from the river into the canal, in which water Adam had as much interest as the canal commissioners.  To deny to the canal commissioners the power to make the arrangement embodied in the consent decree would be to advocate the doctrine, that riparian proprietors on opposite banks of a stream cannot make arrangements with each other for the joint use of the water in the stream.

For the reasons above stated, we are of opinion .that the consent decree was a valid decree, and that William Adam thereby secured valuable rights, which cannot be taken from his devisees by the present appellant without compensation.  Therefore, the order of the court below,

179—28

and the instructions given as above referred to, cannot be regarded as erroneous for the reasons urged by appellant.

The only remaining question relates to the amount of the compensation awarded to the appellees for their property by the verdict of the jury, and the judgment of the court below based thereon. There was the usual conflict as to the value of the interests to be condemned by the sanitary district between the witnesses introduced by the appellant and those introduced by the appellees. The witnesses of the appellees value the property as a whole or in its entirety, while the witnesses called for the appellant value the different parts of the property, or interests therein, separately. All the property of the appellees sought to be condemned appears to have been used for milling purposes and mill-dam purposes. It was used as an entirety, and it would seem that it ought to have been valued as an entirety. The witnesses of the appellant value separately the naked real estate without reference to the uses to which it was then put, or to which it might be put. They prove the value of the buildings separately from the real estate without reference to their use and connection with the property, as an entirety. Another set of witnesses testify as to the value of the machinery in the mills; another set as to the selling value of the water power; another set as to the cost of the dam and the water gates. All the estimates made by these witnesses were of separate and distinct parts of the property without reference to the joint connection and use of all the parts. Valuing the property, including real estate, buildings, the dam across the river, the mills, milling privileges, and the water power, as an entirety, the witnesses of the appellees estimated its value at figures ranging all the way from $100,000.00 to $175,-000.00. One witness valued the water power alone at $40,000.00. The verdict of the jury fixed the value of the whole property at $70,000.00 only, an amount lower than any estimate made by any witness of the appellees.

In view of the facts thus stated in regard to the evidence as to value, we see no reason for disturbing the verdict of the jury by reason of the conflict in the evidence, or because of any alleged excess in the damages awarded. The jury examined the property, and heard the testimony. They were authorized to consider that testimony in connection with their own judgment in determining the just compensation to be awarded to the appellees. Where there is diversity of opinion and conflict of testimony as to the value of the property proposed to be taken or damaged, and the jury have made a personal inspection, this court will not reverse on the ground that the damages are excessive, or inadequate, or that the evidence does not support the verdict. The jury have a right to base their verdict to some extent upon their own examination of the property. (*Davis* v. *Northwestern Elevated Railroad Co.* 170 Ill. 595).

The judgment of the circuit court of Will county is affirmed.

*Judgment affirmed.*